[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14345

_____

D.C. Docket No. 9:10-cv-81612-DTKH

JONATHAN E. PERLMAN, as Court-Appointed
Receiver of Creative Capital Consortium, LLC,

Plaintiff-Appellant,

versus

WELLS FARGO BANK, N.A.,
successor-in-interest to Wachovia Bank, N.A.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 6, 2014)

Before MARCUS and DUBINA, Circuit Judges, and HODGES,[*] District Judge.

PER CURIAM:

From November 2007 through December 2008, George Theodule operated a vast Ponzi scheme in South Florida.  For five months in 2008, Theodule maintained some of the proceeds of his illegal operations in various accounts with Defendant Wells Fargo Bank, N.A.[1]  Plaintiff Jonathan E. Perlman is the court-appointed receiver for several related entities (the "Receivership Entities")[2] created and used by Theodule to perpetrate his Ponzi scheme.  Perlman filed suit against Wells Fargo alleging, among other things, claims that the Bank aided and abetted Theodule's operation of the Ponzi scheme, and claims of fraudulent transfers in violation of Florida's Uniform Fraudulent Transfer Act.  The district court dismissed these claims with prejudice, finding that Perlman failed to plead facts sufficient to raise a plausible inference that Wells Fargo had actual knowledge of Theodule's Ponzi scheme.  The district court also denied as futile Perlman's request for leave to file a second amended complaint.

---

[*]Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

[1] During the events that gave rise to this case, the bank was known as Wachovia Bank, N.A.  Wells Fargo later acquired Wachovia, and is Wachovia's successor-in-interest.  For ease of reference, we will refer to both banks as "Wells Fargo."

[2] The related entities include Creative Capital Consortium, LLC, A Creative Capital Concept$, LLC, United Investment Club, Reverse Auto Loan, LLC, Wealth Builders Circle, LLC., The Dream Makers Capital Investment, LLC, G$ Trade Financial, Inc., and Unity Entertainment Group, Inc.

2

Perlman appeals the district court's order of dismissal without leave to amend. While we agree with the district court that Perlman's First Amended Complaint failed to sufficiently allege claims for relief, we disagree that any further amendments would be futile and we therefore remand the case with instructions to allow Perlman leave to file his second amended complaint.

## I.

We review *de novo* a district court's dismissal of a complaint for failure to state a claim upon which relief could be granted. Starship Enters. of Atlanta, Inc. v. Coweta Cnty., Ga., 708 F.3d 1243, 1252 (11th Cir. 2013). And we review the denial of a motion to amend a complaint for abuse of discretion and review de novo whether the requested amendment would be futile. Tampa Bay Water v. HDR Eng'g, Inc., 731 F.3d 1171, 1178 (11th Cir. 2013); Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007).

## A.

Because this case was dismissed on a Fed. R. Civ. P. 12(b)(6) motion, we restate the following facts as alleged by Perlman in his First Amended Complaint, accepting them as true and construing them in the light most favorable to him. Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009).

From November 2007 through December 2008, Theodule, a Haitian national, operated a massive and widespread Ponzi scheme targeting wage earning

Haitian-Americans in South Florida, Atlanta, New Jersey, and Chicago.  Holding himself out as a Christian pastor, Theodule promised investors that he would double their investment within 90 days, with little or no financial risk, and that he was offering his investment expertise to help build wealth within the Haitian community.

Under Theodule's direction, more than 100 "investment clubs" were organized as vehicles to gather and collect the investment proceeds.  The investment clubs would pool investor funds and transmit them to the Receivership Entities, minus a 10% commission, for an anticipated 90 day period, during which the investors believed that Theodule was trading stocks and options on their behalf to multiply profits.  Theodule also used the Receivership Entities to pay false "profits" to initial investors – the typical Ponzi scheme technique – to trick future investors into believing that the promise of large financial returns was a reality.  By the time the Securities and Exchange Commission intervened on December 29, 2008, Theodule had succeeded in bilking investors out of more than $68 million dollars.

Theodule initially kept the Ponzi scheme's bank accounts, including the accounts of the Receivership Entities, at Washington Mutual Bank.  In March 2008, Theodule began moving his accounts to Wells Fargo, after he was informed that Washington Mutual intended to close the accounts due to suspicious activity.

4

Theodule began his relationship with Wells Fargo by opening four accounts for Creative Capital Consortium, LLC. ("Creative Capital")  – denominated as a payroll account, a wire account, a deposit account, and a checking account.  The accounts were initially classified as relating to a "money service business" and were later reclassified as relating to "investment business" and "securities/commodities" business activity.

Over the next five weeks, 36 "feeder accounts" were opened at Wells Fargo by other persons, including Theodule's wife and sister.  These "feeder accounts" transferred $2.2 million directly to the Creative Capital accounts in the first month alone.  During this same time, $140,000 in cash was deposited directly into the Creative Capital accounts, and Theodule withdrew $235,000 in currency from these same accounts.  Wells Fargo assisted Theodule in making these large cash withdrawals by permitting Theodule to receive the cash through the drive-thru window in order to reduce the risk of theft.

Within six weeks after Theodule opened the Creative Capital accounts, Wells Fargo noted in internal documents suspicious activity in one of the "feeder" investment club accounts, the Wealth Builders Circle, LLC account.  Numerous small-dollar, even-amount checks from individuals totaling $400,000 had been deposited into the account, and those funds were then transferred directly to the Creative Capital accounts.  Wells Fargo placed a freeze on the Wealth Builders

5

account, which it removed four days later after receiving a "Creative Capital Consortium Business Plan" from one Creative Capital's employees. Perlman alleges, however, that the business plan was "nonsensical" on its face and contained numerous obvious inconsistencies.

From May 9, 2008 through July 31, 2008, a period of less than three months, $10,067,443.51 was deposited into the Creative Capital accounts and $10,560,239.93 was withdrawn, substantial portions of which were disbursed directly to Theodule and his wife. On July 24, 2008, Wells Fargo informed Theodule's wife that it was closing the Wealth Builders account because there was "no evidence of any investing going on and that funds were merely washing through the account from hand to hand." On August 1, 2008, Wells Fargo closed most, but not all, of the Creative Capital accounts. Over the course of his five-month relationship with Wells Fargo, Theodule transferred more than $38 million through various accounts, including more than $1 million in over-the-counter cash transactions.

**B.**

The Securities and Exchange Commission filed a complaint against Theodule and two of the Receivership Entities on December 29, 2008, alleging violations of various provisions of the Securities and Exchange Act, and the court

6

ultimately appointed Perlman as receiver over all of the Receivership Entities.[3]  On

December 21, 2010, Perlman initiated this action by filing a complaint against

Wells Fargo for its alleged role in the Ponzi scheme and the resulting harm to the

Receivership Entities.[4]  Perlman amended his complaint on April 5, 2011 to assert

eight claims based on aiding and abetting a breach of a fiduciary duty, aiding and

abetting conversion, common law negligence, wire transfer liability under federal

and state law, avoidance of fraudulent transfers, and aiding and abetting of

fraudulent transfers.

Wells Fargo moved to dismiss all of these claims for failure to comply with

Fed. R. Civ. P. 12(b)(6), and for lack of standing.  On November 22, 2011, the

district court dismissed with prejudice the common law negligence claim, the

aiding and abetting fraudulent transfer claim, and the two wire transfer claims, but

found that Perlman had sufficiently alleged standing as well as plausible claims for

---

[3] The SEC action is styled:  The United States Securities and Exchange Commission v. Creative Capital Consortium, LLC, A Creative Capital Concept$, and George Theodule, Case No. 08-81565-CIV-HURLEY/HOPKINS, formerly pending in the United States District Court for the Southern District of Florida.  A multimillion dollar consent judgment was entered in early 2010.

[4] Perlman is not asserting claims for harms inflicted on the individual investors.  His claims are limited solely to those seeking relief based on harms to the Receivership Entities themselves when Theodule misappropriated funds that had been deposited to the credit of the Entities.

aiding and abetting breach of a fiduciary duty and conversion, and for avoidance of fraudulent transfers.[5]

On January 11, 2012 a panel of this Court issued the unpublished opinion in Lawrence v. Bank of America, N.A., 455 F. App'x. 904 (11th Cir. 2012). Lawrence involved a group of investors in a Ponzi scheme who filed a class action against Bank of America, alleging that the bank aided and abetted in the operation of the scheme. The district court held, and this Court affirmed the holding, that the plaintiffs had failed to plead facts sufficient to establish, beyond mere speculation, that the bank had actual knowledge of the Ponzi scheme's wrongful conduct; actual knowledge being an essential element of the aiding and abetting claims under Florida law.

Citing Lawrence, Wells Fargo moved the district court to reconsider its prior order partially dismissing Perlman's amended complaint, and asked the district court to dismiss with prejudice all remaining claims. Perlman opposed Wells Fargo's motion, and also moved for leave to file a second amended complaint to include allegations of newly acquired evidence of Wells Fargo's actual knowledge of the Ponzi scheme's operations. Relying entirely on Lawrence, the district court granted Wells Fargo's motion for reconsideration, found that Perlman had failed to

---

[5] Perlman has not appealed the dismissal of the negligence, aiding and abetting fraudulent transfer, or wire transfer claims.

allege facts sufficient to state claims for aiding and abetting or for fraudulent transfer liability, and dismissed the complaint with prejudice. The district court also denied as futile Perlman's request to file a second amended complaint, holding that the proposed supplemental factual allegations did little more than allege additional red flags which the Bank had no obligation to investigate under Florida law.

## II.

Perlman first argues that the district court erroneously dismissed his aiding and abetting and fraudulent transfer claims as alleged in the First Amended Complaint because the allegations sufficiently raised a plausible inference that Wells Fargo had actual knowledge of the Ponzi scheme and assisted in its operations. Following our prior panel's decision in Lawrence, we disagree.[6]

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff must include in his complaint "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

---

[6] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2. See also Suntree Technologies, Inc. v. Ecosense Intern., Inc., 693 F.3d 1338, 1349 n. 1 (11th Cir. 2012).

inference that the defendant is liable for the misconduct alleged." Id. There must be "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 555-56, 127 S. Ct at 1965-66).

Because the elements of aiding and abetting are the same for both the breach of fiduciary duty and conversion claims, we will consider them together. See Lawrence, 455 F. App'x. 904, 906 ("Given that all of Plaintiffs' claims are predicated on the theory of aiding and abetting, we need only consider whether Plaintiffs adequately alleged the elements of such a claim."). The elements of a cause of action for aiding and abetting in Florida are: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor."[7] Lawrence, 455 F. App'x at 906-07 (citing AmeriFirst Bank v. Bomar, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991) and ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md., 917 So. 2d 368, 372 (Fla. 5th Dist. Ct. App. 2005)). See also S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Florida, Inc., 365 F. App'x. 202, 207 (11th Cir. 2010) (listing elements of aiding and abetting breach of fiduciary duty claim).

The Lawrence panel held that when a claim of aiding and abetting is asserted against a bank, the second element – knowledge – will only be satisfied if the

---

[7] It is undisputed that Florida law supplies the rule of decision in this case.

10

plaintiff pleads facts demonstrating that the bank had "actual knowledge" of the wrongdoings.  Lawrence, 455 F. App'x. at 907.  See also Wiand v. Wells Fargo Bank, N.A., 938 F. Supp. 2d 1238, 1244 (M.D Fla. 2013); Lesti v. Wells Fargo Bank, N.A., Case No. 2:11-cv-695-FtM-29DNF, 2013 WL 1137482 at * 10 (M.D. Fla. Mar. 19, 2013).  And while actual knowledge may be shown by circumstantial evidence, the circumstantial evidence must demonstrate that the aider and abettor actually knew of the underlying wrongs committed.  Wiand, 938 F. Supp. 2d at 1244 (citing Aetna Cas. & Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 536 (6th Cir. 2000) ("[E]vidence establishing negligence, *i.e.*, that a bank 'should have known,' will not suffice.")).  Moreover, Florida does not require banking institutions that conduct routine banking services to investigate transactions involving its demand deposit accounts; therefore, merely alleging that a bank should have known of a Ponzi scheme based solely on a series of purportedly atypical transactions is not sufficient to survive Twombly.  Lawrence, 455 F. App'x. at 907 (citing Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile, 216 So. 2d 443, 446 (Fla. 1968) and O'Halloran v. First Union Nat'l Bank of Fla., 350 F.3d 1197, 1205 (11th Cir. 2003)).

Perlman's First Amended Complaint falls into the precise trap described in Lawrence.  Perlman alleges a multitude of atypical transactions and procedural oddities, including:  Theodule's opening of various accounts, numerous transfers

11

amongst the accounts within short time periods, thousands of deposits of even dollar amounts, large cash deposits and withdrawals, the absence of any investment activity, and Wells Fargo's lifting of the freeze on the Wealth Builders account without further investigation. These allegations fall short of raising a plausible inference that Wells Fargo actually knew that Theodule was engaging in fraudulent activity. At most they list facts that could arouse suspicions, and are not sufficient to trigger any obligation by Wells Fargo to investigate. Lawrence, 455 F. App'x. at 907. While these "red flags" "may have put the bank[ ] on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge. . . ." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006). The district court properly concluded that Perlman's amended complaint failed to state claims for relief for aiding and abetting.

We further find – based on the allegations as they existed in Perlman's First Amended Complaint – that the fraudulent transfer claims were also subject to dismissal. The district court applied the "mere conduit rule," an affirmative defense that requires a defendant to "establish (1) that [it] did not have control over the assets received, *i.e.*, that [it] merely served as a conduit for the assets that were under the actual control of the [transferor] *and* (2) that [it] acted in good faith and as an innocent participant in the fraudulent transfer." In re Harwell, 628 F.3d 1312, 1323 (11th Cir. 2010) (emphasis in original). While normally an affirmative

12

defense cannot be decided at the motion to dismiss stage, in this case the amended complaint "affirmatively and clearly shows the conclusive applicability of the defense to bar the action." Jackson v BellSouth Telecomms., 372 F.3d 1250, 1277 (11th Cir. 2004) (quotations omitted).  The district court found that the allegations of the First Amended Complaint made clear that Wells Fargo acted as a mere conduit because it never exercised control over any of the funds, and because the Bank acted in good faith.  Concerning the Banks good faith, the district court concluded that the allegations of the First Amended Complaint failed to show, or create a plausible inference, that the Bank had actual knowledge of the Ponzi scheme, or that an ordinary prudent person would have been induced to make inquiry or investigate.  See Wiand v Waxenberg, 611 F. Supp. 2d 1299, 1319 (M.D. Fla. 2009); O'Halloran, 350 F.3d at 1205.  Applying Lawrence, we agree.

**III.**

The district court next rejected Perlman's request for leave to file a second amended complaint, finding that any proposed amendments would still fail to state a claim under Lawrence.  District courts may properly deny leave to amend when an amendment would be futile.  Cockrell, 510 F.3d at 1310.  "Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant."  Id. See also Burger King Corp. v. Weaver, 169 F.3d 1310, 1320 (11th Cir. 1999).  In

13

other words, leave to amend should be denied when "the complaint as amended would 'necessarily fail.'" Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co., 470 F.3d 1036, 1040 (11th Cir. 2006) (citation omitted).

Perlman argues that his proposed second amended complaint contains additional information establishing – or at least creating a plausible inference – that Wells Fargo had actual knowledge of the Ponzi scheme, and therefore the proposed amendment would not be futile. We agree.

The proposed second amended complaint, in addition to alleging that Theodule's transactions amongst and between the feeder accounts and the Wealth Builders and Creative Capital accounts were atypical, contains allegations (which must be taken as true) demonstrating Wells Fargo's actual knowledge. Specifically, the proposed amendment contains allegations describing the deposition testimony of Joyce Engstrom, Wells Fargo's vice president and financial crimes investigator/corporate fraud investigator.[8] Engstrom, who has been employed in the banking industry for over 40 years, testified that on May 15, 2008, she received a call from investigator Bart Hodges of Wells Fargo's Loss Management Department, who was investigating a counterfeit check involving the Wealth Builders account. During this conversation, Engstrom and Hodges

_____

[8] Engstrom's deposition was conducted on May 30, 2012, as part of the normal discovery process.

discussed various business accounts, including the Creative Capital accounts. Engstrom further testified that within a short time after the investigation of the Creative Capital accounts was assigned to her, she quickly concluded that there was unusual activity occurring in those accounts such that it "raise[d] the hair on the back of your neck."

According to Engstrom, by May 19, 2008, she and Hodges concluded that it was necessary to contact the Florida Department of Law Enforcement ("FDLE") regarding the suspected unlawful activity in the Creative Capital accounts. Engstrom in fact contacted the FDLE on May 21, 2008 to set up a meeting. She also conferred with an agent of the Internal Revenue Service who serves on a Money Laundering Task Force to review the information she had compiled concerning the activity in the Creative Capital accounts. Lastly, Engstrom testified that Wells Fargo routinely closes accounts within 30 days of the detection of confirmed questionable activity. However, in this case, the accounts operated by Theodule remained open for another three months until August 2008.

In addition to the allegations relating to Engstrom, Perlman's proposed second amended complaint included allegations concerning a Wells Fargo internal report. The internal report appears to have been maintained by Hodges and contains numerous entries related to Theodule's bank accounts. For example, on May 9, 2008, Hodges reported that he had reviewed the activity in the Wealth

15

Builders account and observed numerous small dollar even amount checks from individuals totaling $400,000 that had been deposited into the account. Hodges further reported that he had observed large dollar transfers to Wells Fargo accounts titled to Creative Capital, and that all of the Creative Capital accounts had been opened on the same day in March. Still more, Hodges noted that he had located the under-construction web site for Wealth Builders, which described the entity as an investment club. Hodges concluded, in another May 9, 2008 entry, that he was "[r]estraining all involved accounts pending further investigation." Yet, as previously noted, the accounts remained open for another three months.

The internal report also detailed several communications between Hodges and Theodule and his employees. On May 9, 2008, Hodges received a call from Krissy McKeon, a signator on the Creative Capital accounts who was attempting to send a wire transfer. Hodges told her that the accounts were under review and that no funds would be transferred until the investigation was complete. On May 12, 2008, Hodges spoke to Theodule himself. Theodule stated that he operated numerous branches of his investment business in Florida and Georgia under different names, and that he invested funds for customers in many different areas. Theodule also stated that he was in the process of terminating all business relations with Washington Mutual because Wells Fargo was a "business friendly" bank. Hodges asked Theodule to fax him a typical package that a prospective investor

16

would receive, and advised Theodule that he would be contacting Washington Mutual to obtain further information.

In one additional entry on the internal report, dated May 16, 2008, Hodges reported that the Creative Capital accounts were receiving large deposits, some in cash, with little evidence of any investment activity, and he identified fourteen entities related to Creative Capital that had opened accounts with Wells Fargo.

## IV.

The additional allegations of the proposed second amended complaint, supported by the testimony of Wells Fargo's own representatives, establish a fact pattern that, if proven, a reasonable fact finder could view as sufficient to go beyond "red flags." These allegations could support a plausible inference of actual knowledge by Wells Fargo of the Ponzi scheme which it then aided and abetted by permitting the fraud to continue through use of its accounts after it had actual knowledge of the scheme. The same plausible inference of actual knowledge would also foreclose dismissal of the proposed second amended complaint's fraudulent transfer claims on the basis of Wells Fargo's mere conduit affirmative defense.[9]

---

[9] This should not be read as a determination of law that the mere conduit affirmative defense is unavailable. We hold only that the second amended complaint should be allowed, and the affirmative defense may be asserted and resolved in subsequent proceedings either by dispositive motion or by the fact finder at trial.

17

A court abuses its judicial discretion if, among other things, the judge fails to apply the proper legal standard.  E.g., United States v. Shaygan, 652 F.3d 1297, 1310 (11th Cir. 2011); United States v. Gilbert, 198 F.3d 1293, 1298 (11th Cir. 1999); In re Hillsborough Holdings Corp., 127 F.3d 1398, 1401 (11th Cir. 1997). Here, the proper legal standard is established by Fed. R. Civ. P. 15(a)(2):  "The court should freely give leave [to amend] when justice so requires."  Having concluded that the proposed amendment would not be futile, we also conclude that leave to amend should have been granted under Rule 15(a)(2), and the district court's refusal to grant such leave was an abuse of discretion.

The order and judgment of the district court reviewed on this appeal is VACATED and the case is remanded for further proceedings consistent with this Opinion.[10]

---

[10] On March 28, 2014, another panel of this Court issued an unpublished opinion in a parallel case, Perlman v. Bank of America, Case Nos. 12-13436, 12-14073, 2014 WL 1259462 (11th Cir. Mar. 28, 2014).  The Bank of America matter involved the same trustee, Perlman, alleged similar claims for aiding and abetting and violations of FUFTA, was heard before the same district court, and arose out of the same Ponzi scheme involved in this case.  The Bank of America panel affirmed the dismissal with prejudice of the aiding and abetting claims without leave to amend, reversed the dismissal of the FUFTA claim, and remanded the case for further proceedings.  Bank of America's treatment of the aiding and abetting claims is readily distinguishable.  Perlman's request for leave to amend his aiding and abetting claims in Bank of America was buried in a footnote in one of his briefs, and no detail was proffered with respect to any additional facts that the requested amendment would allege.  By contrast in this case, Perlman made a specific motion before the district court requesting leave to amend, and filed a proposed second amended complaint setting out significant additional facts relating to Wells Fargo's actual knowledge of the ongoing fraud.

18