William M. FREEMAN, Plaintiff,

v.

JP MORGAN CHASE BANK, N.A., Defendant.

Case No: 6:14–cv–121–Orl–22KRS

United States District Court, M.D. Florida, ORLANDO DIVISION.

Signed October 8, 2015

Carl Francis Schoeppl, Terry Gray, Schoeppl & Burke, PA, Boca Raton, FL, for Plaintiff.

Andrew Ross Herron, Brian John Lechich, Jose Antonio Ortiz, Herron Ortiz, PA, Coral Gables, FL, for Defendant.

## ORDER

ANNE C. CONWAY, United States District Judge

This cause comes before the Court for consideration of the Defendant JP Morgan Chase Bank, N.A.'s (the "Bank") Motion for Final Summary Judgment, filed on June 30, 2015 (Doc. No. 85), and Plaintiff William M. Freeman's ("Freeman") Memorandum in Opposition, filed on July 30, 2015 (Doc. No. 95).

Freeman filed this action based on diversity jurisdiction against the Bank on January 27, 2014 (Doc. No. 1). In Freeman's Second Amended Complaint, he asserts the following claims: Negligence (Count I); Gross Negligence (Count II); Aiding and Abetting Fraud (Count (III); and Aiding and Abetting Conversion (Count IV) (Doc. No. 52 at pp. 28–36). For the reasons that follow, the Bank's Motion for Final Summary Judgment will be granted. All other pending motions before the Court will be denied as moot.

## I. FACTUAL BACKGROUND [1]

In September 2011, Roland Larsen ("Larsen"), a business acquaintance of

---

1. Throughout this background section, the Court notes where the parties' versions of the facts conflict. Where the facts conflict, the Court interprets all facts in the light most

Freeman's, approached Freeman regarding a potential investment opportunity for Larsen's company, Sharpe Resources, Inc. ("Sharpe Resources") involving funding for a natural resource development project. (Joint Pre–Trial Statement (Doc. No. 106) at p. 20, ¶ 33 ("JPTS"); Larsen Deposition (Doc. No. 95–19) at 8:16–9:4 ("Larsen Dep.")). In order to finance his development project, Larsen was interested in obtaining a "refundable full recourse loan" in excess of $100,000,000 from a Panamanian corporation called Ziggurat, Inc. (Panama) ("Ziggurat"). (JPTS at pp. 14–16). Ziggurat was an international business that sought out clients in need of multi-million dollar loans. (*Id.* at pp. 14–15). Larsen wanted a loan from Freeman for a $1,000,000 "liquidity deposit," which was a requirement to obtain Ziggurat financing. (*Id.* at p. 14). Ziggurat required a potential loan recipient to deposit a "liquidity deposit"—a pre-set percentage of the full loan amount—into an escrow account maintained by OPT Title & Escrow (respectively, "OPT Title Account" & "OPT Title") at JP Morgan Chase Bank (the "Bank"). (*Id.* at p. 15). Ziggurat represented to potential loan recipients that the funds would remain in the OPT Title Account, would be held for no longer than ninety days, and would be returned if the financing was not successful. (*Id.; see also,* Doc. Nos. 95–26 & 95–27).

Freeman decided to fund the liquidity deposit for Larsen. (*Id.* at p. 20 ¶¶ 34–35). On September 29, 2011, Freeman entered into an agreement with Sharpe Resources and another man, Joseph Cornwell,[2] which addressed the terms of Freeman's $1,000,000 loan (the "Funding Agreement"). (*Id.*). The Funding Agreement provided that Freeman would wire-transfer the $1,000,000 loan directly into the OPT Title Account at the Bank, and that he would be refunded this loan if the financing was unsuccessful. (*Id.*). If the financing was successful, Freeman would receive his $1,000,000 deposit back and an additional $1,000,000 that the parties designated in the Funding Agreement as "interest." (*See* Def.'s Mot. for Summary Judgment (Doc. No. 85–6) ("Def.'s MSJ")). The next day, Freeman wire-transferred $1,000,000 into the OPT Title Account. (JPTS at p. 20, ¶ 35). When Sharpe Resources decided to increase the amount of the Ziggurat multi-million dollar loan, Ziggurat required an increase of $300,000 to the liquidity deposit. (JPTS at p. 20, ¶ 34).[3] On October 4, 2011, after determining that Freeman would provide the additional funding, the parties to the original Funding Agreement executed an amendment, and the following day, Freeman wire-transferred an additional $300,000 to the OPT Title Account. (*Id.* pp. 20–21, ¶¶ 37–38).

Both of Freeman's wire-transfers were accompanied by this instruction: "FBO SHARPE RESOURCES CORPORATION." (*Id.* at p. 21, ¶ 38). Notably, Freeman did not enter into any form of escrow agreement with the Bank. (Larsen Dep. 50:25–51:18). Aside from these wire instructions, there is no evidence that Freeman had any communication with the

---

favorable to the nonmoving party. *See Kingsland v. City of Miami,* 382 F.3d 1220, 1226 (11th Cir.2004).

**2.** Larsen signed the agreement on behalf of his solely-owned company, Sharpe Resources. (Larsen Deposition at 33:7–16). Cornwell was a part of this agreement only because he introduced the parties and was receiving payment for that introduction if the financing was successful. He is otherwise irrelevant to this case.

**3.** This increased Freeman's potential return to $1,300,000 in the event financing was successful.

Bank before depositing his money. Freeman's Funding Agreement and the Amendment thereto were entered into before there was ever an escrow agreement related to Larsen's liquidity deposit. (*See id.* at pp. 20–21, ¶¶ 36–38).

Despite that Freeman had already entered into the Funding Agreement with Larsen's company, Sharpe Resources, Larsen decided he wanted his other company, Standard Energy Company ("Standard Energy"), to be the recipient of the loan and a party to all related transactions. (Larsen Dep. at 43:17–51:14; Doc. Nos. 95–26 & 95–27). Therefore, on October 5, 2011, Standard Energy and Ziggurat entered into a Memorandum of Understanding that contained the terms related to Larsen's receipt from Ziggurat of the multi-million dollar full recourse loan, including the terms of the required "liquidity deposit." (*Id.* at pp. 20–21, ¶¶ 34–40; Doc. No. 95–27). That same day, OPT Title, Ziggurat's escrow agent, entered into an escrow agreement with Standard Energy ("Standard Energy Escrow Agreement"), which provided that the liquidity deposit in the OPT Title Account would not be touched and would be returned if Ziggurat

could not obtain the financing. (*Id.* at ¶¶ 39–40; Doc. No. 95–26). Both of these agreements were entered into after Freeman had already wire-transferred the $1,300,000 liquidity deposit into the OPT Title Account. (*Id.* at 38). Notably, Freeman did not sign the Standard Energy Escrow Agreement nor was he mentioned as a party to this transaction.[4] Almost immediately after his second deposit, Freeman's $1,300,000 loan was misappropriated from the account by OPT Title. (JPTS at ¶ 42–43).

This "too good to be true" deal has an unfortunate ending. Larsen was one of several victims of an international investment scheme[5] perpetrated by a fraudster named Charles C. Gordon.[6] (JPTS at pp.14–16). Gordon's business model was to seek out clients in need of multimillion dollar working capital loans. (*Id.* at p. 14). Gordon was the owner and chief executive officer of both Ziggurat and OPT Title. (*Id.*). The loan Larsen sought to obtain from Ziggurat was a scam that Gordon setup to induce his clients to place into his OPT Title Account the liquidity deposit required for financing. (*Id.* at p. 15).

4. This fact has created much dispute between the parties. Had Freeman been a party to the Escrow Agreement, there would have been no question that OPT Title owed him a fiduciary duty. Since he did not sign it, the parties vigorously dispute the existence of a fiduciary relationship between OPT Title and Freeman.

5. Freeman has presented a great deal of evidence related to one of Gordon's prior victims, Mark Chang. (*See* JPTS at p. 17, ¶¶ 12–23). Chang's circumstances are relevant to the extent that he was a victim of the same fraud scheme as Freeman and whether the Bank had actual knowledge of the fraud. Any evidence from Chang's case and the corresponding time period that may show the Bank's involvement or knowledge in the fraudulent scheme is included in the Factual Background section. The Court notes that all of Chang's transactions related to the fraud

scheme occurred over a year before Larsen was defrauded and Freeman's loan was misappropriated. (*Id.* at p. 17, ¶ 11). Additionally, Chang provided his own liquidity deposit and was a party to his escrow agreement with OPT Title. (*Id.* at p. 17, ¶ 13). Freeman, on the other hand, merely lent money to Larsen for the liquidity deposit. There is no evidence that Freeman had knowledge of or relied on any of the communications between Chang, Chang's business consultants, and the Bank. To the extent that the Chang transaction and related communications with the Bank are relevant, the Court determines under Federal Rule of Evidence 403, that its probative value is substantially outweighed by its unfairly prejudicial effect.

6. Gordon has pled guilty to this fraudulent investment scheme. (JPTS at p. 14).

Rather than leaving the liquidity deposit in the OPT Title Account as he represented to his clients, Gordon would misappropriate the funds, spending them entirely on Ziggurat's operating expenses and Gordon's own personal expenses. (*Id.*).

Gordon had become a customer of the Bank back in September of 2009 when he opened deposit accounts under the name of his escrow company, OPT Title. (*Id.* at p. 16, ¶ 8). OPT Title had three different accounts at the Bank: two of them were business classic checking accounts and one was a "select high yield savings account" that was designated as an in-bound wire account. (Chase Decl. at ¶ 3). Olga Perdomo, a Vice President and Relationship Manager at the Bank, ("Perdomo") assisted Gordon in opening these accounts and was the banker assigned to the accounts.[7] (JPTS at p. 16, ¶ 7; Perdomo Deposition at 58:9–18 ("Perdomo Dep.")). After the OPT Title Accounts were opened, Gordon requested that Perdomo add the words "Escrow Account" on the second line of the account names. (Perdomo Dep. at 25:5–26:7). This designation did not change the nature of the accounts—they remained standard demand deposit checking and savings accounts—nor did this trigger any duty on the part of the Bank under the Bank's policies and procedures in effect in 2009. (Chase Decl. (Doc. No. 85–1) at ¶ 5; Hernandez Dep. at 41:11–42:12; 170:25–174:23). The Bank permits a customer to use an ordinary bank account for escrow purposes so long as the

Bank is not the designated escrow agent. (Hernandez Dep. at 138:22–139:8).

In the two years before Freeman transferred Larsen's loan into the OPT Title Account, there was some unusual activity involving Perdomo and Gordon's OPT Title Accounts. First, in 2009, when Perdomo opened Gordon's OPT Title Accounts, she provided him with two reference letters stating that Gordon has "maintained excellent relationships with the Bank;" however, that same day his initial account-opening deposit had bounced. (Doc. No. 85–2, Composite Ex. 2; Perdomo Dep. at 127:19–25). Second, on June 14, 2010, Gordon transferred $100,000 to a bank account owned by Perdomo's company, Infinit Management, LLC ("Infinit").[8] (JPTS at pp. 1617, ¶¶ 10, 14–16). Perdomo contends that this $100,000 payment was a loan from Gordon, but there are no written loan agreements, and there were never any agreed-upon terms. (*Id.* at p. 17, ¶¶ 14–16; Perdomo Dep. at 20:18–22:3). The Bank's Code of Conduct in 2010 specifically prohibited Bank employees from borrowing money from customers.[9] (JPTS at p. 18, ¶ 18). Around the time she accepted the payment from Gordon, Perdomo was supporting her parents in Colombia and paying her sick father's medical bills. (Perdomo Dep. 40:23–41:3). Perdomo used the money from Gordon to assist in purchasing a home for her parents in Colombia. (*Id.* at 17:24–20:17). Presently, Perdomo has not repaid any of the funds, and she testified that she has not spoken to Gordon since the first quarter of 2011.

---

**7.** Prior to opening Gordon's bank accounts, Perdomo had been introduced to him by her landlord. (JPTS at p. 16, ¶ 7).

**8.** Infinit Management, LLC was owned solely by Perdomo. (JPTS at pp. 16–17, ¶ 10). Perdomo set up the LLC in November of 2009. (*Id.*). Between October and November of 2010, Perdomo changed the name from Infin-

it Management LLC to "Global Infinit Group, LLC." (*Id.* at p. 19, ¶ 27).

**9.** The Bank's code of Conduct contained the following specific prohibition relating to loans from customers: "[. . .] You may not borrow money (other than nominal amounts) from or lend money to other employees, customers or suppliers [. . .]." (JPTS at ¶ 18).

(*Id.* at 61:7–12 & 20:18–22:3). In June of 2011, before Freeman deposited the liquidity deposit, Perdomo was transferred to another branch of the Bank and a new banker was assigned to the OPT Title Accounts. (Perdomo Dep. at 58:3–18; Carmona Deposition (Doc. No. 86–5) at 41:15–25).

Third, in October 2010, one of the Bank's area managers was notified of two separate incidents involving Perdomo that resulted in an investigation by the Bank's Global Security and Investigations Group ("GS & I"). (*See* JPTS at p. 18, ¶¶ 20–28). The first incident involved a matter unrelated to this litigation. (*Id.* at p. 18, ¶ 20). The second incident occurred when an unknown customer presented a letter to the Bank and requested proof that OPT Title was a stable business. (*Id.* at p. 19, ¶ 21). The letter stated that OPT Title currently had "deposits in business checkings and savings accounts in the seven digit amounts" and appeared to have been signed by Perdomo. (Pl.'s Resp. in Opp. to Def.'s Mot. for Summary Judgment (Doc. No. 95–22, Ex. T) ("Pl.'s Resp. in Opp. to MSJ")). At the time the letter was presented to the Bank, one of the Bank's employees checked the accounts and found this statement regarding the amount in the accounts ("seven digit amounts") to be inaccurate, however, the parties dispute this.[10] (*See* Forged Letter, Doc. No. 853). In her interview with GS & I, Perdomo denied writing the letter and called it a forgery. (*Id.* at p. 19, ¶ 29). The Perdomo investigation was subsequently closed. (*Id.* at p. 20, ¶ 30).

Lastly, on June 27, 2011, a $302,000 wire transfer from one of the OPT Title Accounts to the Maldives alerted the Bank's Due Diligence Department to conduct an investigation. (*Id.* at p. 21, ¶ 41). In response, the Bank's Due Diligence Department prepared a written review of OPT Title and its accounts. (*Id.*). The written review noted that this wire-transfer was the only transfer the OPT Title Account had made to a high-risk jurisdiction. (Doc. No. 85–9 at p. 6). While the OPT Title Account was assigned a "risk ranking of moderately high," the Department found that no further action was necessary. (*Id.*).

## II. *SUMMARY JUDGMENT STANDARD*

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the movant who bears the initial burden of "identifying for the district court those portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir.1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir.1994)). In a case in which the non-movant bears the burden of proof at trial, the movant may carry its initial burden by either negating an essential element of the non-movant's case or by demonstrating the absence of evidence to prove a fact necessary to the non-movant's case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir.1993) (citation omitted). Once the movant carries its initial burden,

10. The account had a seven digit balance, but this included the numbers to the right of the decimal point. Freeman contends that a "seven digit amount" does not include any number to the right of the decimal point. Under this approach, a seven digit amount would be $1,000,000 or more. In contrast, the Bank contends that seven digits is seven digits, under this approach, $10,000.57, would be a seven digit amount.

the non-movant may avoid summary judgment by demonstrating an issue of material fact. *Id.* at 1116. If the movant demonstrates the absence of evidence on a material fact for which the non-movant bears the burden of proof, then the non-movant must either show that the record contains evidence that the movant "overlooked or ignored" or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17 (citation omitted). The non-movant must provide more than a "mere scintilla of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990) (citation omitted).

Federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir.2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." (citation omitted)). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead [will] accept [the non-moving party's] version of the facts drawing all justifiable inferences in [the non-movant's] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir.2008). Notwithstanding this inference, "[t]here is [still] no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349. In the context of cross-motions for summary judgment, the summary judgment standard does not change. *Ernie*

*Haire Ford, Inc. v. Universal Underwriters Ins. Co.,* 541 F.Supp.2d 1295, 1297 (M.D.Fla.2008).

## III. SUMMARY JUDGMENT ANALYSIS

### A. Defendant's Standing Argument

The Bank has asserted "lack of standing" a number of times in this litigation, including as an affirmative defense. (*See* Def.'s MSJ (Doc. No. 85) at p. 27; Def.'s Answer (Doc. No. 70) at p, 10)). It does not appear that the Bank is arguing lack of Article III standing because the Bank has not presented the Court with a single case addressing that concept. Instead, the Bank alleges lack of standing in general terms focusing only on the Bank's lack of a legal duty and the fact that Freeman had no relationship with the Bank. (Def.'s MSJ at p. 26). Since the Bank's lack of standing argument seems to be identical to its "lack of legal duty" argument, the Court will address this issue as one of common law legal duty, *infra*.

### B. Counts I & II: Negligence and Gross Negligence

 Freeman brings claims for both negligence and gross negligence. The parties strongly disagree as to whether the Bank owed a duty to Freeman, a non-customer. A court's "determination of the existence of duty is a *minimal* threshold that merely opens the courthouse doors." *Limones v. School Dist. of Lee Cty*, 161 So.3d 384, 389 (Fla.2015) (alteration in original). The existence of a legal duty is a question of law for the court. *Lamm v. State St. Bank & Trust*, 749 F.3d 938, 947 (11th Cir.2014).

 "To maintain an action for negligence, a plaintiff must establish that the

defendant owed a duty, that the defendant breached that duty, and that this breach caused the plaintiff damages." *Fla. Dep't of Corrs. v. Abril*, 969 So.2d 201, 204 (Fla. 2007). Thus, "[t]he first element of a negligence or gross negligence claim under Florida law is 'a legal duty owed by [a] defendant to [the] plaintiff.'" *Lamm*, 749 F.3d at 947 (quoting *Estate of Rotell ex rel. Rotell v. Kuehnle*, 38 So.3d 783, 789 (Fla. 2d DCA 2010)). Since the Bank's argument—that it owed no duty to Freeman as a non-customer of the bank—is dispositive of both Freeman's negligence and gross negligence claims, the Court will discuss them together. (Def.'s MSJ at p. 18).

■ Florida law recognizes the following four sources of duty: (1) statutes or regulations; (2) common law interpretations of those statutes or regulations; (3) other sources in the common law; and (4) the general facts of the case. *Limones*, 161 So.3d at 389. Freeman claims that the present case involves a duty arising out of the general facts of the case. (Pl.'s Resp. in Opp. to MSJ at p. 18). More specifically, Freeman argues that the Bank owed him a duty because its conduct created a "foreseeable zone of risk that posed a general threat of harm to others." *McCain v. Fla. Power Corp.*, 593 So.2d 500, 502 (Fla. 1992). However, Freeman cites no case imposing a duty on a bank to prevent harm to non-customers under the *McCain* "foreseeable zone of risk" test. Therefore, this argument is not persuasive.

■ Generally, banks owe a duty to customers. *See Wiand v. Wells Fargo Bank, N.A.*, 938 F.Supp.2d 1238, 1247 (M.D.Fla.2013). There is no general duty imposed on banks to monitor accounts to protect against misappropriation. *Gevaerts v. T.D. Bank, N.A.*, 56 F.Supp.3d

1335, 1343 (S.D.Fla.2014). Additionally, "banks generally do not owe non-customers a duty to protect them from fraud perpetrated by customers." *Wiand*, 938 F.Supp.2d at 1247 (citing, among others, *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 431 Fed.Appx. 17, 20 (2d Cir.2011). Courts have recognized a narrow exception to this rule: "when a bank fails to act to safeguard trust funds on deposit in a fiduciary account after receiving 'clear evidence' of misappropriation." *MLSMK Inv.*, 431 Fed.Appx. at 20 (citation omitted). As explained in *Wiand*,

> The Fifth Circuit deconstructs this exception into three elements: (1) there is a fiduciary relationship between the customer and the non-customer, (2) the bank knows or ought to know of the fiduciary relationship, and (3) the bank has actual knowledge or notice that a diversion is to occur or is ongoing. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 232 (5th Cir.2010). To satisfy the second element, "the facts [must] support the 'sole inference' that the funds being deposited are held in a fiduciary capacity." *Id.*

*Wiand*, 938 F.Supp.2d at 1247–48 (alteration in original). The Court will refer to this as the "misappropriation exception."

■ In Florida, a fiduciary relationship exists between parties "where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused." *Brigham v. Brigham*, 11 So.3d 374, 387 (Fla. 3d DCA 2009). A fiduciary relationship can be either express or implied. *Id.* A fiduciary relationship implied in law may be shown based on specific facts and circumstances surrounding the transaction. *Id.* To establish a fiduciary relationship absent a contract, "a party must allege some de-

gree of dependency on one side and some degree of undertaking on the other side to advise, counsel and protect the weaker party." *Id.* There is no fiduciary duty unless one party is "under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation." *Bldg. Educ. Corp. v. Ocean Bank,* 982 So.2d 37, 41 (Fla. 3d DCA 2008) (citing *Doe v. Evans,* 814 So.2d 370, 374 (Fla. 2002) (quoting Restatement (Second) of Torts § 874 cmt. a.)).

Escrow holders are both agents of the parties to the escrow and trustees required to act in accordance with the terms of the escrow agreement. *Watkins v. NCNB Nat. Bank of Fla., N.A.,* 622 So.2d 1063, 1064 (Fla. 3d DCA 1993). "[E]scrow holders have a fiduciary duty to exercise reasonable skill and ordinary diligence." *Id.* However, an escrow agent only owes a fiduciary duty to the parties to the escrow agreement. *Id.* at 1065. An escrow agent may also owe a fiduciary duty to the assignee of an escrow agreement, if the escrow agent has actual knowledge of the assignment. *Id.* at 1065; *Resolution Trust Corp. v. Broad & Cassel, P.A.,* 889 F.Supp. 475, 479 (M.D.Fla.1995) (assignment of escrow agreement to third party did not provide specific notice to escrow agent and there was no duty imposed on escrow agent to follow assignment instructions for disbursement).

The second element of the misappropriation exception requires that a bank have knowledge of the fiduciary relationship between the customer and noncustomer. *Wiand,* 938 F.Supp.2d at 1247–48. Lastly, for the third element, estab-

lishing the bank's actual knowledge of the diversion, a party must show that "the bank knows that an actual misappropriation is intended or is in progress." *Id.* at 1248. Proof of knowledge "requires clear evidence of misappropriation," and a bank's negligence in failing to discover a fraud does not amount to actual knowledge. *Id.*

The Bank argues that Freeman must prove the existence of a fiduciary relationship between himself and the Bank's customer, while Freeman "vigorously disputes" that such proof is required. (JPTS at p. 24, n.2). The Court agrees with the Bank that Freeman is required to prove the existence of a fiduciary relationship with the Bank's customer for this narrow misappropriation exception to apply. Freeman has provided no evidence that establishes the existence of a fiduciary duty in the absence of a contractual agreement. The only evidence Freeman proffers is that the Bank may have been on notice that the OPT Title Accounts were escrow accounts due to the name of the account and Freeman's wire instructions. (Pl.'s Resp. in Opp. to Def.'s MSJ at 19–20). This is circumstantial evidence tending to prove nothing more than the Bank's knowledge that its customer, OPT Title, had an escrow account. It does nothing to establish a fiduciary relationship between OPT Title and Freeman.

There is scant record evidence that Gordon (or his companies OPT Title and Ziggurat) was even aware of Freeman's role in this transaction.[11] Notably, Freeman agreed to provide funding to Sharpe Resources, and actually wired his money to the OPT Title Account, before an escrow

---

11. The Court notes that Larsen testified that he asked Gordon that Freeman's signature be on the escrow agreement. (Larsen Dep. at 50:15–24). However, this evidence standing alone is not enough to establish a fiduciary relationship.

agreement even existed between OPT Title and Larsen's company, Standard Energy. Additionally, neither Freeman nor Sharpe Resources are even mentioned in the Standard Energy Escrow Agreement. There is simply nothing that indicates that OPT Title undertook a fiduciary relationship on behalf of Freeman. Since Freeman has not established the first element, the existence of a fiduciary relationship, the Court will grant summary judgment in the Bank's favor because Freeman has not established that the Bank owed him a legal duty.[12]

## C. Counts III & IV: Aiding and Abetting Fraud and Aiding and Abetting Conversion

■ Freeman brings claims for aiding and abetting both fraud and conversion. A cause of action for aiding and abetting requires: "(1) an underlying violation on the part of the wrongdoer; (2) knowledge of the underlying violation; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abetter." *Lawrence v. Bank of Am., N.A.,* 455 Fed.Appx. 904, 906 (11th Cir.2012)[13] (citing *AmeriFirst Bank v. Bomar,* 757 F.Supp. 1365, 1380 (S.D.Fla. 1991)). "In cases where a bank customer has perpetrated a fraudulent scheme, courts have widely held that the bank is not liable for aiding and abetting unless the bank has actual knowledge of its customer's wrongful activity." *Groom v. Bank of Am.,* No. 8:08–cv–2567–JDW–EAJ, 2012 WL 50250, at *4 (M.D.Fla. Jan. 9, 2012).

Gordon plead guilty to the underlying fraud and the parties stipulate that Gordon has engaged in both fraud and conversion, therefore, the Court will not address the first element, "underlying violation." (JPTS at pp. 14–15). Since the elements of aiding and abetting fraud and conversion are identical, the Court discusses them together. This analysis focuses on the remaining elements of an aiding and abetting claim: actual knowledge and substantial assistance.

### 1. Actual Knowledge

■ In establishing the second element of an aiding and abetting claim, courts have held that "knowledge of the underlying violation" requires "actual knowledge." *Lawrence,* 455 Fed.Appx. at 907. In Florida, allegations of atypical money transactions—such as transfers involving large sums of money—are insufficient to trigger liability. *Id.* Notably, actual knowledge may be shown by circumstantial evidence. *See Woods v. Barnett Bank of Ft. Lauderdale,* 765 F.2d 1004, 1009 (11th Cir.1985); *see also, Perlman v. Wells Fargo Bank, N.A.,* 559 Fed.Appx. 988, 993 (11th Cir.2014). Evidence establishing that a bank "should have known" does not establish that the bank actually knew of the underlying violation. *Lawrence,* 455 Fed.Appx. at 907.

■ Recent cases addressing aiding and abetting claims have established a heavy burden for imposing liability on a bank. A number of recent decisions have

---

12. The Court notes that although the existence of a fiduciary relationship in the absence of a contract can, in some circumstances, be a question of fact, no reasonable jury could find the existence of a fiduciary relationship between Freeman and OPT Title based on the record evidence.

13. In the Eleventh Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36–2.

consistently held that evidence of "red flags" standing alone is insufficient for aiding and abetting liability.[14] *Perlman*, 559 Fed.Appx. at 993; *see also, Wiand*, 938 F.Supp.2d at 1244; *see also, Lawrence*, 455 Fed.Appx. at 907. At most, "red flags" may be sufficient to put a bank on notice. *Wiand*, 938 F.Supp.2d at 1244. Negligence or reckless conduct, without more, does not establish actual knowledge. *Id.* at 1246–47 ("[t]here is no authority in Florida tort law for imposing aiding-and-abetting liability on a bank that is reckless but lacks actual knowledge of an underlying wrong"); *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So.2d 368, 372 (Fla. 5th DCA 2005).

Additionally, Freeman argues that the Bank's employees' knowledge is imputed to the Bank. (Pl.'s Resp. in Opp. to MSJ at p. 21). In response, the Bank argues that, even if this is true, the knowledge of the Bank's employee, Perdomo, is not imputed because it falls within the "adverse interest" exception recognized by Florida law. (Def.'s MSJ at p. 27). The Court notes that Freeman has not cited a single case in which a theory of vicarious liability was deemed sufficient for proving a Bank's actual knowledge of a fraud.

■■■ Circumstances involving the imputation of knowledge from agent to principal typically involve questions of law rather than fact. *LanChile Airlines v. Conn. Gen. Life Ins. Co. of N. Am.*, 759 F.Supp. 811, 814 (S.D.Fla.1991). The general rule is that when "an agent acquires knowledge within the scope of his authority," such knowledge is imputed to the principal. *Id.* Florida courts have recognized

an exception to this general rule, the "adverse interest" exception, which applies in circumstances where the agent is "secretly . . . acting adversely to the principal and entirely for his own or another's purposes." *Id.* (quoting *Restatement (Second) of Agency*, § 282). This exception is narrow and applies only "when the agent's conduct is entirely in the agent's interest without even incidental benefit to the principal." *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1369 (Fed. Cir.2013) (citation and quotation marks omitted); *Cadet v. Fla. Dept. of Corrs.*, 742 F.3d 473, 483 (11th Cir.2014).

The Bank first contends that the aiding and abetting claim fails because Freeman has not established knowledge of anything beyond atypical activity in a bank account. (Def.'s MSJ at p. 20). Secondly, the Bank contends that even if Perdomo knew about the fraudulent scheme, that knowledge cannot be imputed to the Bank. (*Id.* at 21). Freeman, however, argues that providing routine banking services to an individual engaged in fraud imposes liability on a Bank that has actual knowledge. (Pl.'s Resp. in Opp. to MSJ at p. 27–28). Freeman argues that he has presented enough evidence to permit a jury finding of actual knowledge. (*Id.*)

■■■ The Court agrees with the Bank that this is a case involving mere allegations of atypical transactions similar to those addressed in *Lawrence*. Freeman's evidence amounts to little more than unusual banking activity, such as the Bank's customer providing misleading information when opening his accounts and a wire-transfer of a large sum of money to a

---

14. For purposes of this Order, the Court uses the term "red flags" loosely to mean any fact patterns or circumstances that are indicative

of money-laundering activity or fraud, such as atypical transactions.

location determined to be "high risk." This evidence standing alone does not raise an inference of actual knowledge under Florida law. Additionally, Gordon's use of the words "Escrow Account" on his regular business accounts was a practice permitted by the Bank and did not impose a duty on the Bank to investigate any further.

To prove actual knowledge, Freeman must produce evidence beyond Gordon's unusual account activity. The only additional evidence Freeman proffers is the conduct of the Bank's employee, Perdomo. Freeman argues that Perdomo had knowledge of the fraud because she opened Gordon's OPT Title Accounts; provided Gordon with reference letters; was investigated for a forged letter; and accepted a payment from Gordon, which Freeman has rather conclusively labeled as a "quid pro quo." In turn, Freeman contends that this knowledge is imputed to the Bank. Freeman's argument is not persuasive because the evidence is not enough to establish the Bank's actual knowledge, and the attempt to impute Perdomo's knowledge is insufficient to meet the high burden of imposing liability on a Bank for a customer's wrongdoing.

First, most of the evidence is not unusual activity for a business bank account. Moreover, a Bank employee has no duty to investigate particular bank accounts, even if there is unusual activity. Thus, when Perdomo permitted Gordon to add the words "Escrow Account" to his bank accounts, a practice the Bank permitted, she did nothing more than carry out her employment obligations. Similarly, the reference letters Perdomo provided to Gordon are not sufficient to establish actual knowledge of fraud. These letters were given to Gordon an entire year before Freeman

decided to loan money to Larsen. There is no evidence that, at the time Gordon requested the letters, they were intended to defraud anyone.

Additionally, the "seven digit letter" and subsequent investigation of Perdomo do not lead to an inference of actual knowledge of the fraudulent scheme. First, Perdomo has denied writing the letter. (Doc. No. 95–22 at p. 3–4). Second, the Bank found the mysterious letter to be concerning and conducted its own investigation into the situation. (*See* Pl.'s Resp. in Opp. to MSJ, Ex. 22). This investigation dispelled the Bank's concerns. This shows nothing more than the Bank was responsive to the unusual activity. (*Id.*).

The bulk of Freeman's argument rests on a conclusory allegation that the unexplained payment from Gordon to Perdomo was a quid pro quo for assisting the fraud scheme. (*See* Pl.'s Resp. in Opp. to MSJ at pp. 14, 26). Aside from Perdomo accepting this payment, there is nothing to show that it was intended to assist Gordon in his fraud scheme. There is no evidence that the Bank was aware of this payment. In fact, Perdomo even took steps to conceal it, as she had Gordon transfer the money to her LLC's bank account. Additionally, Perdomo had been re-located to another Bank branch and was no longer the banker assigned to Gordon's account when Freeman wire-transferred his money into the OPT Title Account. These facts, standing alone, do not show that the Bank had actual knowledge of Gordon's fraud.

▉ Lastly, even if Perdomo had actual knowledge of the fraud, the adverse interest exception would apply because, aside from conclusory allegations, there is no evidence contradicting the evidence that Perdomo accepted the payment entirely

for her own interest. Additionally, Perdomo did not accept the payment within the scope of her employment with the Bank because it was completely disallowed by the Bank's policy and was sent from Gordon to an account at a different bank. Perdomo used the money for entirely personal expenses. (Perdomo Dep. 40:23–41:3; JPTS at pp. 16–17, ¶¶ 10, 14–16). Lastly, Perdomo concealed the payment by having Gordon deposit it in her LLC's bank account. (Perdomo Dep. at 61:7–12 & 20:18–22:3; JPTS at pp. 16–17, ¶¶ 10, 1416). The Court finds that the adverse interest exception prohibits imputing Perdomo's knowledge to the Bank under these circumstances. Additionally, even if Perdomo's knowledge can be imputed to the Bank, no reasonable jury could find that the evidence in this case establishes that the Bank had actual knowledge of Gordon's fraud because the evidence is little more than unusual bank account activity and a conclusory allegation of a quid pro quo involving Perdomo, who was no longer the Bank employee assigned to Gordon's account when Freeman lost his money to the fraud scheme.

### 2. Substantial Assistance

Despite that the Court has already determined that the Bank did not have actual knowledge of the underlying violation in this case, the Court, nonetheless, will address the substantial assistance element to ensure a thorough analysis. The Court concludes that Freeman has not established that the Bank substantially assisted Gordon in his fraud scheme. In order to establish substantial assistance, the third element of an aiding and abetting claim, the plaintiff must show that the defendant "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [underlying violation]

to occur." *BCJJ, LLC v. LeFevre,* No. 09–CV–551, 2012 WL 3071404, at *34 (M.D.Fla. July 27, 2012). "Failing to act, absent a duty to act, is not substantial assistance." *Hines v. FiServ, Inc.,* No. 08–CV–2569, 2010 WL 1249838, at *4 (M.D.Fla. Mar. 25, 2010). A defendant's actions are not substantial assistance unless "his action, or inaction, was a substantial factor in causing the [underlying violation]." *In re Palm Beach Fin. Partners, L.P.,* 517 B.R. 310, 348 (Bankr.S.D.Fla. 2013) (internal quotation marks omitted). If the defendant's alleged assistance is minor in comparison to the overall scope of the fraud, substantial assistance will not be found. *Id.* at 349. Courts consider a number of factors in determining if the defendant provided substantial assistance: "the nature of the act encouraged, the amount of assistance given, the aider-and-abettor's presence or absence at the time of the tort, its relation to the primary actor, and its state of mind." *Id.* at 348.

In the present case, there is no evidence amounting to the Bank's or its employee's "affirmative assistance" to Gordon's fraudulent scheme. Additionally, banks do not have a duty to actively monitor fiduciary accounts. *Gevaerts,* 56 F.Supp.3d at 1343. A bank does not provide substantial assistance by merely permitting a wrongdoer to "create accounts, transfer funds among accounts, and make withdrawals from accounts." *Lawrence,* F.Supp.2d at 907. Therefore, the only way that substantial assistance can be found is by showing that the Bank concealed Gordon's fraud. There is little evidence that shows the Bank concealed Gordon's fraud. Most of the evidence, such as providing reference letters to Gordon or investigating unusual account activity, merely shows that the Bank further investigated "red

flags." Given the nature and extent of Gordon's scheme, it cannot be said that the Bank's failure to discover the fraud was a substantial factor of the fraud. Additionally, even if the Bank's employee, Perdomo, had a role in concealing Gordon's fraud, she was no longer assigned to the OPT Title Account when Larsen became a victim of the fraud scheme and Freeman wire-transferred the liquidity deposit to the OPT Title Account on Larsen's behalf. Thus, the Court concludes that the Bank did not provide substantial assistance to the fraud.

## IV. CONCLUSION

It is well-established that a negligence claim cannot survive absent a legal duty on the part of the tortfeasor. Florida law is very clear that banks do not owe a duty to non-customers of the bank, nor do banks have a duty to investigate atypical transactions. Unfortunately, Freeman's only chance of success on his negligence claim hinged on a very narrow misappropriation exception that has been sparingly applied to impose liability on Banks. Since Freeman has not demonstrated that this exception has been appropriately met, the Court cannot impose a legal duty on the Bank. Therefore, the Bank has met its burden of showing that it is entitled to judgment as a matter of law on Counts I and II.

There is a similarly high standard for imposing aiding and abetting liability on a bank. Notably, a bank cannot be held liable for aiding and abetting unless it is shown that the bank had actual knowledge of the fraud and provided substantial assistance. Actual knowledge is not established by showing that a bank "should have known" of the fraud; that a bank was reckless; or that a bank was merely negligent. In the present case, Freeman has not been able to establish that the Bank actually knew that Gordon was perpetrating a fraud. Due to this, Freeman's aiding and abetting claims, Counts III and IV, fail as a matter of law.

Therefore, based on the foregoing, it is **ORDERED** as follows:

1. The Defendant's Motion for Final Summary Judgment, filed on June 30, 2015 (Doc. No. 85) is **GRANTED.**

2. In light of the Court's determination on the Defendant's Motion for Final Summary Judgment, the following motions are **DENIED** as moot:

 a. The Bank's Motion to Strike Expert Witness and Expert Witness Report, filed on May 8, 2015 (Doc. No. 67);

 b. Freeman's Motion to Strike Answer to Amended Complaint (Defendant's Affirmative Defenses), filed on June 5, 2015 (Doc. No. 76);

 c. Freeman's Motion to Exclude/Limit Testimony of Defendant's Rebuttal Expert, Paul A. Carubba, Esq., filed on June 24, 2015 (Doc. No. 80);

 d. Freeman's Motion for Partial Summary Judgment regarding the usury affirmative defense, filed on June 30, 2015 (Doc. No. 81);

 e. Freeman's Motion in Limine Regarding Usury Issues, filed on June 30, 2015 (Doc. No. 82);

 f. Freeman's Motion to Modify Case Management and Scheduling Order and Seeking Leave to Disclose Expert Report of Professor Ste-

phen K. Halpert, filed on June 30, 2015 (Doc. No. 83);

g. The Bank's Motion *in Limine* Regarding Re–Cross Examination of Non–Party Witness, filed on June 30, 2015 (Doc. No. 84);

3. The Clerk shall enter a judgment providing that the Plaintiff William M. Freeman shall take nothing on his claims against the Defendant, JP Morgan Chase Bank, N.A. The judgment shall further provide that the Defendant shall recover its costs of this action.

4. The Clerk is **DIRECTED** to close this file.

**DONE** and **ORDERED.**