610 So.2d 632 (1992)
Paul SHIMEK, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 90-2171.
District Court of Appeal of Florida, First District.
December 15, 1992.
Rehearing Denied January 26, 1993.
*633 Spiro T. Kypreos, Pensacola, for appellant.
Robert A. Butterworth, Atty. Gen., and Virlindia Doss, Asst. Atty. Gen., Tallahassee, for appellee.
ZEHMER, Judge.
Paul Shimek, Jr., appeals his conviction on three counts of grand theft and one count of conducting or participating in an enterprise through a pattern of racketeering activity in violation of the Florida Racketeer Influenced and Corrupt Organization (RICO) Act. Appellant raises several points challenging his racketeering conviction. He also contests the grand theft convictions based on the denial of his motions to sever one of those counts. The state cross-appeals the sentences imposed, urging that the trial court effected a downward departure without providing the required written reasons. We affirm in part, reverse in part, and remand for further proceedings.

I.
On February 12, 1990, the state filed an amended information that charged Appellant, a Pensacola attorney, with four counts of grand theft in violation of section 812.014, Florida Statutes (1987). The fifth count charged a violation of the Florida RICO Act, section 895.03, Florida Statutes (1987), and listed the four grand theft counts as predicate offenses. The amended information named the following victims of the grand theft counts: Jerry T. Webb and Jacob Gingerich as to count one; Brenda Hamilton Skipper as to count two; Melvin Pierce as to count three; and Vincent LaCoste as to count four. The RICO count alleged that Appellant, "either being an enterprise, or employed by or associated with an enterprise, did conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity and did engage in at least two (2) incidents of racketeering activity." It listed the four theft counts as the predicate incidents and then alleged that "all incidents of racketeering activity [have] the same or similar intent, results, accomplices, victims or methods of commission or ... otherwise are interrelated by distinguishing characteristics and are not isolated incidents... ." Prior to trial, Appellant moved to sever the Skipper count (count two) from the other counts and to strike the Skipper count as a predicate offense for the racketeering count on grounds that this count was unrelated to the other alleged transactions or episodes. The trial court denied the motions.
At trial, the state contended that Appellant violated the Florida RICO Act by conducting or participating in an "enterprise," described as Joseph's First International Bank, LTD. (JFIB), with several other individuals, including Marie Kline, Jack Finegold, and Pete (or M.G.) Kennedy, through a pattern of racketeering activity, including the four counts of grand theft, in violation of the Florida RICO Act. At the conclusion of the state's case, Appellant moved for judgment of acquittal, and the trial court denied the motion. This motion was renewed at the close of the evidence and again denied. At the charge conference, the trial court rejected Appellant's proposed special jury instruction on the racketeering count and gave a charge fashioned by the court based on the Standard Jury Instructions in Criminal Cases. Appellant's counsel did not object to the charge so given. The jury returned a verdict of not guilty as to count one (Webb and Gingerich), guilty on the remaining counts for grand theft, and guilty on the RICO count. On July 3, 1990, the trial court entered judgment in accordance with the jury's verdict and sentenced Appellant to four concurrent 3-year terms of imprisonment. The court also entered an order of probation, imposing four concurrent 12-year periods of probation, to be served after imprisonment.

*634 II.
Appellant first contends that the trial court erred in denying his motions for judgment of acquittal because the state failed to meet its burden of proving essential elements of the RICO charge  the "continuity" and "relatedness" of at least two of the predicate incidents. Appellant argues that the Pierce-LaCoste transactions are a single predicate incident that is unrelated to the Skipper incident because the latter has no nexus whatsoever to Appellant's position in or relationship to JFIB. The evidence also shows, Appellant argues, that there are no similarities with respect to the alleged methods of committing the two predicate incidents, the types of victims, or the accomplices involved, and no evidence shows that Appellant acted as representative or principal in all of the incidents. Appellant further argues that the state failed to prove that the two predicate incidents posed a threat of long-term criminal conduct, which is required by the "continuity" element of the racketeering offense. The alleged JFIB investment scheme was manifestly brief, Appellant argues, because the Pierce-LaCoste incident lasted only a few days; and, even if the unrelated Skipper incident is counted, the alleged scheme lasted only a few months. Thus, he contends, there was "`no reasonable possibility of continuous existence'" of the enterprise.
The state contends that the trial court properly denied Appellant's motions for judgment of acquittal on the racketeering count because a showing of "continuity" is not required under the Florida RICO Act. Even if "continuity" is required under the Florida RICO Act, the state argues, it satisfied its burden of proving this element by showing that, unlike the cases where Florida courts have found that the criminal behavior was limited by the finite number of victims involved in a single fraudulent scheme, this case involved multiple, similar schemes and different victims, and Appellant could practice his deception for as long as he could find fresh victims. Further, the state argues that it established a sufficient relationship between either the Pierce and LaCoste counts, or between the Pierce and LaCoste counts and the Skipper count, which were all connected by virtue of their similarity of intent, results, accomplices, methods of commission, and distinguishing characteristics  the common elements being the involvement of JFIB's principals and Appellant's misuse of trust account monies.

A.
The state's contention that a showing of "continuity" is not required under the Florida RICO Act has already been answered adversely to the state's argument.
The elements of a RICO offense under the Florida RICO Act[1] have been described *635 as (1) the existence of an enterprise, which the defendant was employed by or associated with in committing the crimes, (2) a pattern of racketeering activity, and (3) at least two "incidents" of racketeering or racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission, or that are otherwise interrelated by distinguishing characteristics and are not isolated incidents. Boyd v. State 578 So.2d 718 (Fla. 3d DCA), rev. denied, 581 So.2d 1310 (Fla. 1991). Although no provision of the Florida RICO Act explicitly provides that the "pattern of racketeering activity" includes a "continuity" requirement, in Bowden v. State, 402 So.2d 1173 (Fla. 1981), the supreme court made it quite clear that the Florida RICO Act, similar to the federal act, includes a "continuity" requirement. Likewise, in State v. Lucas, 600 So.2d 1093 (Fla. 1992), the court recently reaffirmed that requirement and approved the concepts expressed by the United States Supreme Court in H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), concerning the continuity requirement and the proof necessary to establish it.

B.
After extensive review of this voluminous record, we have determined that the state's evidence was sufficient to make out a case for the jury on all elements of the charged RICO offense, including the "continuity" requirement. We base this conclusion on the following facts that the jury could find from the evidence.
At trial, it was the state's theory that JFIB, the "enterprise" involved, was a "shell bank," having no offices, building, or employees, formed by Pete Kennedy in 1987 with funds he received from Marie Kline pursuant to a charter for offshore banking obtained from the island of Montserrat, West Indies. The evidence established that Pete Kennedy filed the application for JFIB's charter through a California firm, using money provided by Marie Kline and listing himself as the only owner. JFIB's "charter" did not allow it to do any banking business anywhere. JFIB subsequently maintained an office in Montserrat, West Indies, without any employees, and an office in Montreal, Canada. JFIB used the office of a lawyer in Montserrat who represented dozens of enterprises or banks similar to JFIB. The Canada office was located in a building in Montreal owned by Tej Thind, owner of International Financial Marketing. JFIB's employees there included Kennedy, who "watched over" the Canada office, and Tej Thind, who performed "administrative services" for JFIB and a number of other enterprises. JFIB had a checking account in a legitimate bank, Royal Trust, in Canada. At some point, Kline or one of her subsidiaries was issued stock in JFIB. JFIB made loans to a number of individuals, including Kline, that were never repaid.
It was also the state's theory that Appellant, acting as attorney for JFIB, associated with some or all of the JFIB principals  Pete Kennedy, Marie Kline, and Jack Finegold  in a scheme to "rip people off of their money" on a "grand scale," including convincing the alleged victims to give them money for loan origination fees or for investments with JFIB, which were never realized, under terms extremely more favorable than the going rates.
The predicate incidents all occurred during several months in 1988. The Pierce and LaCoste offenses apparently arose out of the same transaction. In early 1988, Marie Kline approached Ralph Massey, Pierce and LaCoste's friend and attorney, about an investment involving the exchange of foreign currencies and prime bank notes that would yield a return substantially greater than the going rate. Kline stated that "for the investment of $110,000 the investors could get back their money plus $70,000." Kline gave Massey some information about her relationship *636 with JFIB and its principals, although Massey was unsure of the bank's function. In March 1988, Massey relayed this information to Pierce and LaCoste, two Alabama businessmen. When Massey told Kline that Pierce and LaCoste were interested in investing $55,000 each, Kline instructed Massey that Appellant was to be contacted in writing for details about investing the money and that the funds were to be sent to Appellant's trust account. After Appellant was informed that Pierce and LaCoste were interested in the investment, Appellant sent Massey two letters on his law firm's letterhead, each dated March 21, 1988, addressed to Pierce and LaCoste. The letters stated that Appellant was attorney for JFIB; that upon Appellant's receipt of their investment of $55,000 each into his trust account the letter would be "effective"; that closing on the transaction was scheduled for April 29, 1988; and that for their investment they would receive the original investment plus an additional $70,000. After Pierce and LaCoste each wired $55,000 to Appellant's trust account[2] as instructed, Appellant had his secretary open a "JFIB Closing Account" in his ledger. Several disbursements were made from the account to the various individuals involved with JFIB beginning on the day the funds were received in Appellant's trust account: $5,000 to Kline; $35,000 to Kennedy; $10,000 to Appellant's firm; $1,976.90 for a golf cart for Kline's son; $40,000 to Bob Windham;[3] and $10,000 to William and Maria Kerr for a transaction in which Kline was involved. Neither Pierce nor LaCoste ever received back his original investment, much less the return on investment promised in Appellant's letters.
The Skipper offense arose under somewhat different circumstances. Appellant provided legal representation for Skipper in a personal injury suit and obtained a settlement on her behalf. When Appellant received a check representing those sums, he endorsed it and deposited it into his trust account. On the evening of December 2, 1988 (or maybe in August 1988, Skipper could not recall), Appellant called Skipper on the telephone, informed her that he had received the settlement money, and told her that he had found a place where he could invest it at 9% interest. Skipper told Appellant to "put it down in writing, put the details down in writing and mail it to me," but she did not authorize Appellant to obtain a CD with the money. Prior to this call, however, Appellant already had withdrawn most of Skipper's settlement money from his trust account. Appellant subsequently sent Skipper a check for $2,364.63 and a certificate of deposit in Skipper's name indicating that the sums were deposited in JFIB. In his letter of December 6, 1988, Appellant informed Skipper of the receipt of the funds, indicated that he still owed her $87,000, and stated that he intended to use the CD to discharge that obligation. Skipper was very upset when she received the CD; so, after making a copy of the certificate, she mailed it back to Appellant with a letter demanding the payment of her $87,000. Appellant never paid Skipper, but instead sent her a series of letters explaining why he could not do so. Among other things, the letters explained that the money was deposited in JFIB and could not be withdrawn for a period of four months without the loss of interest. Skipper never received the proceeds of the settlement from Appellant. There was testimony *637 that JFIB is now "out of business" and "inactive."
The evidence showed that Appellant and the JFIB principals used JFIB to engage in or cover up several schemes to convince individuals either to advance fees for loans with JFIB or to invest in JFIB with promises of extraordinary returns that were never realized. Like the Pierce-LaCoste transaction, the Skipper transaction involved an alleged investment scheme in JFIB, some of the other JFIB principals, and the use of Appellant's trust account to channel the victims' funds. The CD that Appellant sent to Skipper for the money that he owed her was issued by JFIB in Skipper's name, rather than to "bearer," and signed with an illegible "authorized signature." At trial, Kennedy testified that at some point in time Appellant had a discussion with Kennedy in which Appellant told Kennedy that he was in trouble with Skipper. Appellant told Kennedy that he had spent Skipper's money and that Skipper had agreed to accept a CD from JFIB for the money Appellant owed her. Kennedy then asked Appellant if he was willing to sign a note in an effort to pay Skipper back because the bank had to have something to offset the $87,000 charged on one side. The record also contains a letter written by Appellant to JFIB's "Vice President Kirk" after Skipper demanded her money, indicating that Skipper wanted her money instead of the CD issued by JFIB. On this evidence, the jury could have found that the Skipper incident was connected to the other offenses in that all involved investment schemes by Appellant with some or all of the JFIB principals and the use of Appellant's trust account to funnel the money to the various JFIB principals.
We conclude that the evidence, if accepted by the jury, was sufficient to prove a prima facie case as to all elements of the RICO offense. It established an enterprise that Appellant employed in committing the criminal offenses in a pattern of racketeering activity and at least two incidents bearing the requisite similarity of method and purpose. The evidence also established the continuity requirement as defined by the supreme court in Lucas. Even treating the Pierce and LaCoste transactions as one "incident" within the meaning of the statute, there was a sufficient relationship between those transactions and the Skipper transaction to satisfy the statutory requirement of two incidents. Lucas; State v. Russo, 493 So.2d 504 (Fla. 4th DCA 1986), rev. denied, 504 So.2d 768 (Fla. 1987).
Accordingly, we affirm the trial court's denial of Appellant's motion for judgment of acquittal on the RICO offense.

III.
Appellant's next two points contend that the trial court erroneously denied his requested instruction on the RICO charge, and that the charge actually given by the court was not only incorrect but directed the jury to find against the Appellant on essential facts.
Appellant requested the court to give the following instruction:
Before you can find the defendant guilty of conducting or participating in an enterprise, the State must prove the following two elements beyond a reasonable doubt:
1. The defendant was employed by or associated with an enterprise.
2. The defendant conducted or participated, directly or indirectly, in such enterprise through a pattern of racketeering activity by engaging in at least two of the following incidents of Grand Theft as charged in Counts I, II, III, and IV of the Information.
3. Of those incidents in which the defendant was engaged, at least two of them had the same or similar intents, results, accomplices, victims, methods of commission, or were interrelated by distinguishing characteristics and were not isolated incidents.
In order to constitute a pattern of racketeering activity, the incidents must amount to or otherwise constitute a threat of continuing racketeering activity.
"Enterprise" means any individual, sole proprietorship, partnership, corporation, business trust, union chartered under *638 the laws of Florida, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity, and includes lawful as well as unlawful enterprises and governmental as well as other entities.
(Emphasis added.) Except for the emphasized language added by Appellant, this instruction is identical to that found in the Florida Standard Jury Instruction in Criminal Cases, at page 269, intended to be given when a RICO charge is based on "conduct or participation in an enterprise through a pattern of racketeering activity."
The court denied this requested instruction and gave the following instruction to the jury:
Before you can find the defendant guilty of unlawful conduct or conducting or participating in an enterprise, the State must prove the following two elements beyond a reasonable doubt: The defendant was employed by or associated with an enterprise; two, the defendant conducted or participated directly or indirectly in such enterprise by engaging in at least two of the following elements, following incidents of the grand theft that is charged in Counts I, II, III and IV. As charged in the information, of course, three of those incidents in which the defendant was engaged, at least two of them had the same or similar, intent, results, accomplices, victims, methods of commission or were interrelated by distinguishing characteristics and were not isolated incidents. ...
(Emphasis added.) This instruction was fashioned by the court and patterned after, but certainly not consistent with, the standard jury instruction. At trial, neither the defense nor the state made a contemporaneous objection to this instruction.

A.
Appellant's requested instruction was based on Bowden v. State, 402 So.2d 1173, wherein the supreme court held:
[The statutory] definition of "pattern of racketeering activity" suggests that the similarity and interrelatedness of racketeering activities should be stressed in determining whether a "pattern of racketeering activity" exists. As used in this statute, the word "pattern" clearly requires more than accidental or unrelated instances of proscribed behavior. We construe the pattern element to require, in addition to similarity and interrelatedness of racketeering activities, proof that a continuity of particular criminal activity exists.

402 So.2d at 1174 (emphasis added). It is thus settled that "continuity" is an essential element of this offense that must be sufficiently charged in the allegations of the information. State v. Lucas, 600 So.2d 1093. A fortiori, it is an essential element of the offense on which the court must instruct the jury.
The trial court has a duty to determine the applicable substantive law and instruct the jury on that law, and the trial judge's decision on these matters has historically enjoyed a presumption of correctness on appeal; however, to be sustained on appeal, the instructions must include a sufficient statement of the statutory elements of the substantive offenses charged to enable the jury to arrive at a verdict based upon an accurate statement of the law they are to apply to the evidence before them. State v. Bryan, 287 So.2d 73 (Fla. 1973), cert. denied, 417 U.S. 912, 94 S.Ct. 2611, 41 L.Ed.2d 216 (1974); Davis v. McAllister, 631 F.2d 1256 (5th Cir.1980), cert. denied, 452 U.S. 907, 101 S.Ct. 3035, 69 L.Ed.2d 409 (1981). In this case, one of the most disputed issues at trial was whether the evidence was sufficient to satisfy the continuity requirement of the pattern of racketeering element. Certainly, since this factual issue was being tried by the jury, it had to be adequately instructed on the law applicable to that issue.
The instruction actually given by the court, as well as the standard jury instruction on which it was patterned, did not adequately instruct on the element of continuity described in Bowden and Lucas; indeed, both were silent as to this element. Lack of proof of the requisite continuity to *639 prove a pattern of racketeering was Appellant's principal defense to this RICO charge, and Appellant's counsel argued this defense to the jury even though the court had refused to instruct on it. Since the law is clear that a defendant is entitled to have the jury instructed by the court on each essential element of the case that is disputed and material to his defense, it was error for the court to deny the requested charge. Cf. State v. Delva, 575 So.2d 643 (Fla. 1991). The court's denial of the requested instruction on this element, especially in light of the confusing instruction actually given (hereafter discussed), deprived Appellant of a fair trial on the charged RICO offense.
The state argues, however, that Appellant's requested instruction was itself an incorrect statement of the law regarding the element of continuity and thus would have been misleading to the jury. We agree with the state's assertion that continuity may be proved either by showing a closed period of repeated conduct or showing past conduct that by its nature projects into the future with a threat of repetition. State v. Lucas, 600 So.2d 1093, quoting H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. at 241-43, 109 S.Ct. at 2901-03. We do not agree, however, with the state's assertion that Appellant's requested instruction was misleading because it addressed only the "threat of continuing racketeering activity" and did not mention the closed period aspect. We reject this argument because the evidence presented in this case would support only an instruction on the aspect of continuity that could be predicated on the threat of repetition; there was no proof of a closed period of repeated conduct. It is now the law that a court is not bound to instruct on an element of the offense that is not in dispute, State v. Delva, and we find no merit to this argument.
The court's failure to give Appellant's requested instruction was reversible error.

B.
Appellant further contends that the instruction the court gave to the jury was tantamount to a directed verdict or a "mandatory conclusive presumption" because it directed the jury to find Appellant guilty of three of the four grand theft charges and, because two of the predicate incidents were said to be related, guilty of the racketeering charge. Since that instruction also excluded crucial language that is included in the standard jury instructions, Appellant argues, the trial court should have read at least the standard jury instruction (although it, too, is deficient for the reasons discussed above) after deciding not to give Appellant's requested instruction.
We agree that the last sentence of the instruction given amounted to a peremptory or conclusive instruction on certain critical facts as well as a comment by the judge on the evidence, although we are confident it was not so intended by the trial judge. This sentence improperly instructed the jury that "[a]s charged in the information, of course, three of those incidents in which the defendant was engaged, at least two of them had the same or similar, intent, results, accomplices, victims, methods of commission or were interrelated by distinguishing characteristics and were not isolated incidents" (emphasis added). The instruction did not make it clear that these matters were left open for decision by the jury. It did not indicate that this was an element that the state was required to prove, rather than facts the jury should assume had already been established. This last sentence of the instruction is also incorrect because the amended information charged four, not three, predicate offenses. Finally, the sentence misstates crucial language of section 895.04 which requires proof of predicate offenses that have:
the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within five years after a prior incident of racketeering conduct.
(Emphasis added.)
We do not reverse on this error because Appellant did not make a contemporaneous *640 objection to its deficiencies. However, the court's denial of the requested instruction on the essential element of continuity was reversible error and the instruction actually given was insufficient to instruct on this essential element of the offense. Thus, Appellant's conviction on the RICO charge must be reversed and remanded for a new trial.

IV.
Appellant's next point argues that his convictions on the grand theft counts must be reversed because the trial court erred in denying his motions to sever and strike count two (the Skipper count) of the amended information from the trial of the other counts. In view of our determination that the Skipper count was sufficiently related to the Pierce and LaCoste counts to support the RICO charge, we conclude that the trial court did not abuse its discretion in denying these motions. Accordingly, Appellant's convictions on the three grand theft counts are affirmed.

V.
On cross-appeal, the state contends that the trial court erred in departing downward from Appellant's recommended guidelines sentence without providing written reasons for departure. The state argues that while Appellant's guidelines scoresheet called for a sentence of 4 1/2 to 5 1/2 years of imprisonment, the trial court improperly departed downward and sentenced Appellant to 3 years' incarceration followed by 12 years on probation without providing any written reasons for departure. We agree that this was error. Jano v. State, 559 So.2d 1270, 1272 (Fla. 4th DCA 1990) (sentence that departed downward from the recommended guidelines sentence reversed and cause remanded for resentencing where the trial judge gave no written reasons for downward departure); Webster v. State, 500 So.2d 285, 288 (Fla. 1st DCA 1986) (oral statements made by the judge at sentencing will not satisfy sentencing guidelines requirements of written reasons for departure).
However, in view of the reversal of Appellant's conviction on the RICO count, his entire sentence must be vacated and remanded for resentencing.
To summarize, Appellant's convictions on the three grand theft counts are affirmed; his conviction on the RICO count is reversed and the cause remanded for a new trial on that count; and his entire sentence is vacated and remanded for resentencing.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
SHIVERS and WOLF, JJ., concur.
NOTES
[1] The following provisions of that Act are relevant to the issues on this appeal.

Section 895.03, Florida Statutes (1987), provides in part:
(1) It is unlawful for any person who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.
(2) It is unlawful for any person, through a pattern of racketeering activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.
(3) It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.
(Emphasis added.)
Section 895.02(3) defines "enterprise" to mean:
Any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental, as well as other entities.
Section 895.02(4) defines "pattern of racketeering" activity to mean:
engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within five years after a prior incident of racketeering conduct.
(Emphasis added.)
[2] Pierce wired his payment on March 22, 1988; the record does not indicate when LaCoste wired his payment.
[3] Bob Windham was an individual who had previous dealings with Kline and Appellant in a number of meetings regarding a loan for approximately $50 million that Windham was interested in obtaining from JFIB. During these meetings, Windham understood that Appellant acted as JFIB's closing agent. Windham paid the requested 2% service loan fee of $2,500 and a $40,000 advance fee payable to a Dr. Jack Finegold, who Appellant told Windham was also involved with JFIB. Windham was later informed in a series of letters that the loan was approved for a different amount and on different terms, but Windham never received any proceeds of the loan. After repeated requests, Windham eventually received the return of his advance fee, paid by Appellant out of the funds Appellant had received from Pierce and LaCoste. While none of the grand theft counts involved in this case include the Windham incident, the state was allowed to introduce evidence regarding this transaction.