# Third District Court of Appeal

## State of Florida

Opinion filed June 28, 2017.

THIS OPINION IS NOT FINAL UNTIL DISPOSITION OF ANY FURTHER
MOTION FOR REHEARING AND/OR MOTION FOR REHEARING EN
BANC.  ANY PREVIOUSLY-FILED MOTION FOR REHEARING EN BANC
IS DEEMED MOOT.

_____

No. 3D15-1062
Lower Tribunal No. 14-3721

_____

**MP, LLC,**
Appellant,

vs.

**Sterling Holding, LLC, etc., et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Jennifer D.
Bailey, Judge.

Joel S. Perwin, P.A., and Joel S. Perwin; Heller Waldman, P.L., and Glen H.
Waldman and Jason Gordon, for appellant.

Duane Morris LLP, and Harvey W. Gurland, Jr., for appellee TD Bank, N.A.

Before ROTHENBERG, FERNANDEZ,* and SCALES, JJ.

_____

* Judge Fernandez did not participate in oral arguments.

ON MOTION FOR REHEARING

ROTHENBERG, J.

We grant the appellant's motion for rehearing, withdraw our opinion filed on December 21, 2016, and substitute the following opinion in its place.[1]

The trial court granted TD Bank, N.A.'s ("TD") motion to dismiss MP, LLC's ("MP") claims against TD based on the conclusion that the complaint fails to allege sufficient facts to support MP's claims against TD. Because the facts alleged are more than sufficient to withstand dismissal, we reverse.

Although MP has sued multiple defendants, its claims against TD are contained in Counts II and VII for civil conspiracy; Count IV for violation of Florida's RICO Act statute; and Count X for aiding and abetting another defendant's breach of its fiduciary duties to MP. Before addressing the allegations, it is important to note that TD is the successor in interest to Mercantile Bank ("Mercantile"), and because they represent one entity, they will be referred to either as "the Bank" or, when appropriate, the specific bank will be identified.

---

[1] The appellant, MP, LLC, filed a motion for rehearing en banc of the original panel opinion. Pursuant to this Court's Internal Operating Procedures, when a motion for rehearing en banc is unaccompanied by a motion for rehearing, the motion for rehearing en banc is treated as including a motion for rehearing which must be ruled upon by the panel. Wade v. State, 57 So.3d 993, 994 (Fla. 3d DCA 2011); see also Romero v. State, 870 So. 2d 816, 818 (Fla. 2004) ("By treating motions for rehearing en banc as including motions for rehearing, the Third District adheres to the spirit of Florida Rule of Appellate Procedure 9.040(d), which is to 'disregard any procedural error or defect that does not adversely affect the substantial rights of the parties.'").

2

The operative complaint alleges as follows. While Mercantile was negotiating its takeover by TD, Mercantile realized that it needed to shore up its portfolio of non-performing loans in order to maximize the sales price and to avoid governmental scrutiny. Thus, the complaint alleges that Mercantile conspired with the four majority members ("the Majority Members") of Sterling Holding, LLC ("Sterling") and other entities owned by the Majority Members of Sterling ("the Non-Sterling Entities") without the knowledge and to the detriment of the plaintiff, MP, which was a Minority Member of Sterling.

At the time of the alleged conspiracy, the breakdown of Sterling's membership interests was as follows: Arriaga Enterprises owned a 25% interest; Howard Family Partners owned a 25% interest; Raffaele Williams owned a 25% interest; Scott Weinberg owned a 12.5% interest (combined, "the Majority Members of Sterling"); and MP owned a 12.5% interest. MP claims that in early 2010, when Mercantile was being sold to TD, the Non-Sterling Entities were in financial trouble or in default of their loans with Mercantile and that these loans were the largest non-performing loans in Mercantile's portfolio. Thus, MP claims that Mercantile conspired with the Non-Sterling Entities and the Majority Members of Sterling (who all had membership interests in the Non-Sterling Entities) to cross-collateralize these non-performing loans with solvent property owned by Sterling.

3

To consummate the transaction, MP's signature was required. However, because the Majority Members of Sterling and Mercantile believed that MP would never agree to the dilution of Sterling's interest to benefit the Bank and the Non-Sterling Entities, which MP had no interest in, and that MP would most likely move to enjoin the transaction and draw unwanted attention and scrutiny, MP was not told about the transaction, which closed in April 2010. In addition to not informing MP about the transaction, the complaint alleges that the Sterling defendants created fraudulent documents omitting MP as a member of Sterling, and the Bank, **which had full knowledge of MP's membership interest in Sterling**, accepted these fraudulent documents and consummated the cross-collateralization.

MP further alleges that in January 2014, the Bank declared a technical default of its loans to Sterling and the Non-Sterling Entities for failure to obtain the requisite insurance and to escrow two months of property taxes. Because Sterling's loan could not be carved out from the properties owned by the Non-Sterling Entities due to the cross-collateralization, a short sale was conducted and MP's 12.5% interest in Sterling was rendered worthless.

The trial court dismissed with prejudice MP's fifth amended complaint based on: (1) MP's failure "to narrow its legal theories to those most likely to sustain legal analysis under the facts"; (2) the trial court's inability to "identify in

4

this repeated effort at pleading, any duty to MP which TD Bank breached"; (3) MP's failure to plead any facts demonstrating the Bank's actual knowledge that the documents it relied on, and which failed to reflect MP's existence, were false; (4) MP's failure to plead the elements of conspiracy as to the Bank; and (5) MP's failure to allege any facts demonstrating any action taken by the Bank to defraud MP. The trial court essentially found that if any fraud, conspiracy, or wrongdoing took place, it was without the Bank's knowledge and participation. As will be demonstrated below, the complaint clearly and repeatedly alleged the Bank's actual knowledge and participation in the alleged wrongdoing.

The dissent agrees with the trial court that the Bank's alleged wrongdoing is not actionable in tort. While we agree that generally the relationship between a lender and a borrower is contractual and thus does not normally extend the duties past what are contractually required, in this case, MP has alleged that the Bank conspired with the Sterling defendants to commit tortious acts against MP, and that the Bank itself committed tortious acts against MP for its own benefit. While we recognize that the allegations are just that – allegations, they are sufficiently pled to withstand dismissal for failure to state a cause of action.

## STANDARD OF REVIEW

Because the trial court was ruling on a motion to dismiss the complaint, rather than on a motion for summary judgment, the trial court was "required to

5

'treat the factual allegations of the complaint as true and to consider those allegations in the light most favorable to the plaintiffs.'" Siegle v. Progressive Consumers Ins. Co., 819 So. 2d 732, 734-35 (Fla. 2002) (quoting Hollywood Lakes Section Civil Ass'n v. City of Hollywood, 676 So. 2d 500, 501 (Fla. 4th DCA 1996)). Whether the allegations in the complaint are sufficient to state a cause of action is an issue of law, which we review de novo. Siegle, 819 So. 2d at 734.

## THE ALLEGATIONS

### I. Counts II and VII, Civil Conspiracy

The elements of a claim for civil conspiracy are: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997). There is no requirement that each co-conspirator commit acts in furtherance of the conspiracy; it is sufficient if each conspirator knows of the scheme and assists in some way. Charles v. Fla. Foreclosure Placement Ctr., LLC, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008).

The trial court found that the complaint failed to allege that the Bank was a part of the conspiracy, caused any harm, or had an independent duty to MP. Instead, the trial court found that the allegations in the complaint only show that

6

the Bank was a passive and unknowing conduit for the alleged wrongdoings of the Non-Sterling Entities and the Majority Members of Sterling. Based on the following allegations taken from the operative complaint, the trial court's findings are clearly incorrect. The complaint clearly alleges that the Bank had actual knowledge as to each conspiracy

**A. <u>The general allegations related to the conspiracy alleged in Count II</u>**

Paragraph 47 of the complaint alleges that prior to the April 2010 loan closing, a Credit Approval Request Memo was prepared. Paragraph 48 alleges that under the "Ownership/Management Composition" section of this memo, a breakdown of the ownership of each Sterling entity was provided, and in this breakdown, MP was listed as holding a 12.5% membership interest. Paragraph 49 states that "[a]s a consequence of the 2010 Memo, which was prepared prior to the execution of the April 2010 transaction, **the Bank was without question aware of MP's interest in Sterling and purposefully colluded to ram through the transaction to MP's significant detriment without its otherwise required signature.**" (emphasis added).

Besides purposefully keeping MP out of the loop, paragraph 51 alleges:

To further the scheme of reducing the loan ratios, Mercantile failed to include certain insurance required by the mortgage covenants in the mortgage payment for the loans. By doing so, Mercantile was able to make it further appear that the debt to income ratios of Sterling and the Non-Sterling Entities were within an acceptable range so that regulators would not require additional reserves, and Mercantile could

7

give the appearance that one of its largest loan portfolios was performing so that TD would proceed with the acquisition of Mercantile.

The next several paragraphs explain that to effectuate the cross-collateralization, Mercantile required that each of Sterling's members sign off on the new obligation. The complaint then details the scheme that was allegedly orchestrated to hide MP's membership interest by falsifying the documents. Paragraph 60 specifically alleges that at the closing of the loan modification, sworn representations were made omitting MP's membership interest in Sterling, and states: "Of course, not only did Arriaga, Howard, Weinberg and Williams [the Majority Members of Sterling] know this was false, but **so did** . . . **the Bank** . . . ." (emphasis added).

> Paragraphs 71 and 72 also specifically allege the Bank's knowledge:
>
> 71. As for Mercantile's knowledge of the fraud, beyond that which is evident by the 2009 [loan modification review] and the 2010 Memo, MP's managing member met Nachman with Lozano [the Bank's loan officer] a short time prior to the loan modification which closed on April 2010. **Lozano was well-aware, as the loan officer who processed the loan modification of the loan on Palmetto Gardens, that MP was in fact a member of Sterling and held a 12.5% membership interest in Sterling**.
>
> 72. . . . Notwithstanding that knowledge, Lozano on behalf of the Bank, participated in and manipulated matters on Mercantile's side to make sure that the closing went through to the benefit of among others, Mercantile.

(emphasis added).

8

**B. The specific allegations related to the conspiracy alleged in Count II**

Count II realleges paragraphs 1 through 123 and then specifically lays out the allegations regarding the alleged scheme by the Bank and others to falsify the documents and omit MP's interests as a member of Sterling in order to preclude MP from objecting to the loan modification, cross-collateralization, and other actions for the benefit of the co-conspirators. Paragraphs 135 and 136 allege that there was an agreement by the Majority Members of Sterling (who also had membership interests in the Non-Sterling Entities) to omit MP as an owner of Sterling from the documents required by the Bank for the loan modification and cross-collateralization. **Paragraph 137 specifically alleges that the Bank and the Bank's loan officer, Lozano, were part of the agreement to remove MP's name as an owner of Sterling from these documents "while knowing that MP was in fact an owner of Sterling."** Further, paragraph 141 alleges:

> TD, as successor in interest to Mercantile, took actions in furtherance of the conspiracy through Lozano, who was an employee of Mercantile, by facilitating the refinancing and/or modification of the loan for Palmetto Gardens **with knowingly fraudulent documents excluding MP's existence, despite having direct knowledge that MP was a member of Sterling, and by accepting loan documents that intentionally omitted MP as a member of Sterling and falsely stated the membership interest of Sterling, in order to bring the loans back into balance so the sale to TD could close.**

(emphasis added).

As this recitation of the allegations clearly demonstrates, Count II of the

9

operative complaint sets forth more than sufficient allegations to satisfy the pleading requirements of civil conspiracy as it relates to the Bank. Contrary to the trial court's order, MP has sufficiently alleged that the Bank actually knew that the documents it relied on, and which failed to reflect MP's existence, were false. The complaint alleges that the Bank was not merely a passive conduit to the conspiracy and fraud allegedly committed by the Majority Members of Sterling; rather, the Bank was a willing and active participant in the scheme to keep MP in the dark in order to maximize the sales price of Mercantile to TD by shoring up Mercantile's portfolio.

**C. The general allegations related to the conspiracy alleged in Count VII**

The conspiracy alleged in Count VII involves the short sale of Palmetto Gardens Industrial Park ("Palmetto Gardens"), which was purchased by Sterling in 2005 with approximately $10.5 million in loans. Paragraph 22 alleges that this was a successful venture that produced a positive yearly cash flow. On or about June 29, 2009, Sterling entered into a promissory note, mortgage, and security agreement with the Bank in the amount of $14.4 million (Paragraph 24). The operative complaint further alleges that to consummate the refinancing, the Majority Members of Sterling entered into a cross-collateralization of the Palmetto Gardens property with other obligations in which the Majority Members of

10

Sterling had an interest, without MP's knowledge or consent, thereby encumbering MP's sole interest in Sterling.

Paragraph 203 of Count VII alleges that SAA, the management company for Sterling, and the Non-Sterling Entities

> entered into an agreement whereby SAA would not pay insurance premiums or pay the escrowed property taxes to TD in order to trigger a default of the loan documents, and would fail to cure the default, for among other reasons, to trigger the cross collateralization of Palmetto Gardens, which was cash flow positive, and could be utilized to get the members of Sterling other than MP out from under the debt on the Non-Sterling Entities.

Paragraph 204 alleges that in January 2014, TD declared the anticipated technical default of the Palmetto Gardens loans.

Count VII further alleges that when MP learned of the Bank's declaration of default, it filed a lawsuit against the alleged conspirators, which, at that point, did not include the Bank. Shortly thereafter, the alleged conspirators and the Bank conspired to sell Palmetto Gardens at a short sale at a greatly reduced price, allowed two of the Majority Members of Sterling (Arriaga and Howard) to retain an under- the-table interest in Palmetto Gardens, and ensured that SAA be retained by the new owner to act as the management company for the property. Paragraphs 212 alleges that as part of the conspiracy, the Bank agreed to release all of the guarantors from millions of dollars in guarantees, even though the properties were sold at a discount, without requiring the guarantors to produce financial statements

11

in order to determine their ability to cover the loans or cure the defaults.

Paragraph 217 alleges that the Bank entered into this agreement with the other alleged conspirators to avoid the allegations of wrongdoing against it in this lawsuit and to eliminate the bad debt it was carrying. And, as already articulated, the complaint alleges that the Bank was able to commit this conspiracy by knowingly accepting falsified documents omitting MP's membership interest so that the cross-collateralization could be accomplished in the first place.

As these allegations are more than sufficient to withstand dismissal for failing to satisfy the pleading requirements of civil conspiracy as it relates to the Bank, the trial court erred by dismissing Counts II and VII of the fifth amended complaint.

## II. Count IV, Violation of the Florida Racketeer Influenced and Corrupt Organization Act

To survive a motion to dismiss Count IV, alleging a violation of the Florida Racketeer Influenced and Corrupt Organization Act ("RICO"), MP was required to plead the following elements:

> (1) the existence of an enterprise, which [the Bank] was employed by or associated with in committing the crimes, (2) a pattern of racketeering activity, and (3) at least two 'incidents' of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission, or that are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

Shimek v. State, 610 So. 2d 632, 634-35 (Fla. 1st DCA 1992) (citing Boyd v.

12

<u>State</u>, 578 So. 2d 718 (Fla. 3d DCA 1991)).

In dismissing the operative complaint, the trial court concluded that the complaint failed to sufficiently allege the Bank's knowledge that the documents it was relying on, when it cross-collateralized the Non-Sterling Entities non-performing loans with solvent property owned by Sterling, were fraudulent. As already addressed in detail, the complaint clearly and unequivocally has alleged that the Bank was a knowing and willing conspirator with full knowledge of the falsity of the documents it relied on to accomplish the cross-collateralization, and the benefits it expected as a result of its participation in the alleged conspiracy. We, therefore, turn to the elements MP was required to plead in support of its RICO claim.

**A. <u>The existence of an enterprise which the Bank was employed by or associated with in committing the crimes</u>**

As previously addressed, the operative complaint alleges that the Bank conspired with the Majority Members of Sterling and the Non-Sterling Entities to cross-collateralize the largest non-performing loans, and in some cases, loans which were in default, in Mercantile's portfolio prior to the sale of Mercantile to TD. To accomplish this goal, it is alleged that Mercantile conspired with the Majority Members of Sterling to allow the Bank to cross-collateralize Sterling's healthy and profitable properties with other defaulting and non-performing loans owed by the Non-Sterling Entities, in which the Majority Members of Sterling

13

each had a financial interest. And to accomplish this cross-collateralization without drawing any attention, it is alleged that, with the Bank's knowledge and consent, fraudulent documents omitting MP's interest in Sterling were prepared by Sterling's Majority Members and were used by the Bank. This was done because MP, which held no interest in the Non-Sterling Entities, surely would have objected to and would have attempted to block the transaction, which would have drawn attention to the weaknesses in Mercantile's portfolio. Thus, the complaint sufficiently alleged the existence of and the Bank's participation in the RICO enterprise.

## B. A pattern of racketeering activity

To establish a "pattern of racketeering activity," MP was required to plead facts establishing a continuing course of conduct or a "series of related predicates extending over a substantial period of time," State v. Lucas, 600 So. 2d 1093, 1094 (Fla. 1992) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241-43 (1989)), which is commonly referred to as "continuity." Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1265 (11th Cir. 2004). In Lucas, the Florida Supreme Court held that predicate events occurring over a six-month period were sufficient to prove continuity. Lucas, 600 So. 2d at 1093.

MP has alleged that the wrongful predicate acts took place over a period of many months. The complaint alleges that the conspiracy, including the

14

falsification and the acceptance of the falsified documents, took place in April 2010, and the refinancing was effectuated shortly thereafter.  In January 2014, the Bank declared a technical default of the loans for Palmetto Gardens (the property owned by Sterling) and the Non-Sterling properties due to the failure to maintain insurance and escrow property taxes.  (Paragraph 109).  After the default was filed, MP filed the instant lawsuit against the alleged conspirators, except for the Bank, and put the Bank on notice that it might be added to the lawsuit.  The complaint alleges that, thereafter, the Majority Members of Sterling, the Bank, and SAA, the management company, "entered into an agreement to use the excuse of the technical default to enter into a contract for a short sale to a buyer who was all too familiar with Arriaga and Howard" (Paragraph 112); sold the properties at a reduced price (Paragraph 118); and released the guarantors from their personal guarantees for the Palmetto Gardens property without even attempting to determine if the guarantors had sufficient assets to satisfy the loan deficiency (Paragraph 121).  The purpose of this agreement was to allow the Bank and the Majority Members of Sterling to eliminate the debt on the Non-Sterling properties and to hopefully avoid allegations of wrongdoing by MP (Paragraph 122).  Therefore, because the alleged predicate acts spanned not just months, but years, the continuity or pattern of racketeering activity requirement was adequately pled.

C. **The final element—The existence of at least two incidents of racketeering conduct**

The third and final element which must be pled when alleging a RICO violation is the existence of "at least two 'incidents' of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission, or that are otherwise interrelated by distinguishing characteristics and are not isolated incidents." Shimek, 610 So. 2d at 635. For the sake of brevity, we will not repeat the allegations already articulated, which include at least two acts: (1) the falsification and use of falsified documents to facilitate the plan to cross-collateralize Sterling's healthy property with underperforming loans owed by the Non-Sterling Entities, in which the Majority Members of Sterling each held a financial interest; and (2) the creation of a technical default on the Sterling and Non-Sterling properties, which enabled the Bank to sell the properties and eliminate the bad debt associated with the non-performing Non-Sterling Entities loans.

The intent of the co-conspirators was the same: financial gain. The purpose, result, and method of commission were all interrelated: to keep MP out of the loop in order to facilitate the cross-collateralization without drawing any attention, and to subsequently use the healthy Sterling properties to allow the Majority Members of Sterling to eliminate their bad debts with the Bank and to allow the Bank to remove these bad debts from its books.

Because the elements of RICO were all pled in the operative complaint, the

trial court erred by dismissing Count IV based on MP's failure to sufficiently plead a cause of action.

## III. Count X, Aiding and Abetting Another Defendant's Breach of its Fiduciary Duty to MP

The trial court's order failed to articulate the grounds upon which it dismissed Count X. We will, therefore, state the elements of aiding and abetting the breach of another's fiduciary duty, which admittedly is an uncommon, and yet not an unheard of cause of action, see Pearlman v. Alexis, No. 09-20865-CIV, 2009 WL 3161830, *5 (S.D. Fla. Sept. 25, 2009) (noting that Florida law recognizes the tort of aiding and abetting a breach of another's fiduciary duty); Williamson v. Answer Phone of Jacksonville, Inc., 118 So. 2d 248, 250 (Fla. 1st DCA 1960) (reversing the trial court's order dismissing Williamson's complaint, in which she alleged that the telephone company had changed a classification title "*for the purpose of aiding and abetting [the other] defendants—in the accomplishment of their intention and purpose to defraud the public and injure the plaintiff.*"), and then examine the allegations contained in the operative complaint to determine whether MP satisfied the pleading requirements.

To establish a cause of action for aiding and abetting another defendant's breach of its fiduciary duty to the plaintiff, the plaintiff must allege: "(1) a fiduciary duty on the part of the wrongdoer; (2) a breach of fiduciary duty; (3)

17

knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Fla., Inc., 365 Fed. Appx. 202, 207 (11th Cir. 2010) (applying Florida law); Pearlman, 2009 WL 3161830 at *5. The Eleventh Circuit Court of Appeal, interpreting Florida law in Perlman v. Wells Fargo Bank, N.A., 559 Fed. Appx. 988, 993 (11th Cir. 2014), and Lawrence v. Bank of Am. N.A., 455 Fed. Appx. 904, 907 (11th Cir. 2012), specifically held that when a claim of aiding and abetting is asserted against a bank, the knowledge element can only be satisfied if the plaintiff pleads facts demonstrating that the bank had actual knowledge of the underlying wrongs committed. See also Wiand v. Wells Fargo Bank, N.A., 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013).

Count I specifically alleges that as the managing member of Sterling, Arriaga owed a fiduciary duty to each of the members of Sterling, including MP, and paragraph 127 lists eleven ways in which Arriaga breached his fiduciary duty to MP. Paragraph 129 also alleges that Howard Law Offices, the firm that represented Sterling in the 2010 loan modification and cross-collateralization, and Howard individually, owed a fiduciary duty to Sterling, including MP, and that Howard Law Offices and Howard breached that duty by preparing documents omitting MP's membership interest in Sterling and misrepresenting Sterling's membership interests. Thus, the first two elements were clearly alleged in the

18

operative complaint. The third and fourth elements: the Bank's knowledge of the breach of fiduciary duties owed to MP by Arriaga, Howard Law Offices, and Howard, and the Bank's substantial assistance or encouragement of their wrongdoings, were also painstakingly pled in MP's complaint. It was, therefore, error for the trial court to dismiss Count X of MP's complaint.

## CONCLUSION

The trial court's dismissal of MP's complaint was based on its inaccurate reading of the operative complaint and consideration of the elements relevant to each cause of action. Although the trial court's dismissal was based primarily on MP's failure to allege knowledge on the part of the Bank, the operative complaint clearly and repeatedly alleged the Bank's actual knowledge of and willing participation in the alleged wrongdoing. The trial court therefore erred by dismissing MP's complaint.

Reversed; remanded.

FERNANDEZ, J., concurs.

**MP, LLC v. Sterling Holding, LLC, etc., et al.**

**3D15-1062**

SCALES, J. dissenting.

I respectfully dissent and would not grant MP, LLC's motion for rehearing in this case. While the majority opinion is compelling, and contains an excellent outline of the facts and causes of action alleged by MP, LLC, I would affirm the trial court's dismissal of MP, LLC's claims against TD Bank, N.A. because I am not persuaded that a commercial lender owes the alleged underlying duties to a minority member of one of the lender's borrowers.

Indeed, if true, the alleged actions of TD's predecessor, Mercantile Bank, might border on the unethical; but I agree with the trial court that such actions are

20

simply not actionable in tort. In my view, the duties Mercantile, a commercial lender, owed to participants in the commercial transaction with Mercantile's borrower, Sterling Holding, LLC, are specified in the parties' written loan documents. See generally Silver v. Countrywide Home Loans, Inc., 760 F. Supp. 2d 1330, 1339 (S.D. Fla. 2011) ("[T]here is no tort duty to process loans competently. The relationship [between bank and borrower] is contractual; there is either a breach of that contract or not.")  In my view, under the facts of this case, Mercantile owed no common law tort duties to its borrower, Sterling, much less to MP, LLC, a minority member of Sterling. See, e.g., Watkins v. NCNB Nat'l Bank of Fla., 622 So. 2d 1063 (Fla. 3d DCA 1993).

I am particularly concerned that the majority opinion imposes previously unrecognized obligations on commercial lenders to police the internal corporate governance of their borrowers. From a practical perspective, the majority's reversal seems to entangle lenders in borrowers' internal disputes. Not only might such entanglements deter lenders from making otherwise prudent loans, but to impose such duties on lenders might encourage an uncomfortable level of bank-meddling into the strictly internal affairs of borrowers.

I would deny rehearing.